J-A03027-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF G.J.W. | : | IN THE SUPERIOR COURT |
| | : | OF PENNSYLVANIA |
| | : | |
| APPEAL OF: C.M. AND J.M. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1454 MDA 2019 |

Appeal from the Decree Entered August 5, 2019
In the Court of Common Pleas of Luzerne County
Orphans' Court at No:  A-8737

| | | |
|---|---|---|
| IN RE:  ADOPTION OF S.N.W., A MINOR | : | IN THE SUPERIOR COURT |
| | : | OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: C.M. AND J.M. | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1455 MDA 2019 |

Appeal from the Decree Entered August 5, 2019
In the Court of Common Pleas of Luzerne County
Orphans' Court at No:  A-8735

BEFORE:  LAZARUS, J., STABILE, J., and DUBOW, J.

MEMORANDUM BY STABILE, J.:                    **FILED MAY 28, 2020**

C.M. ("Mother") and her husband, J.M. (collectively, "the Petitioners"), appeal from the decree entered August 5, 2019, which denied their petitions to terminate the parental rights of J.W. ("Father") involuntarily, with respect to his minor children, S.N.W., a female born in October 2006, and G.J.W., a male born in February 2011 (collectively, "the Children").  In addition, Father's privately-retained counsel has filed a motion to withdraw her representation

in this Court. After careful review, we affirm the decree and deny counsel's motion to withdraw without prejudice to her ability to request relief in the orphans' court.

Our review of the record reveals the following factual and procedural history. Mother and Father were never married but lived together from 2004 until 2013. N.T., 6/4/19, at 7. Father commenced a custody action after the parties' separation, which resulted in an order awarding him supervised partial physical custody of the Children. *Id.* at 7-10, 30. This arrangement lasted until 2016, when the custody court entered a new order directing that Father attend one hour of counseling with the Children each week, followed by three hours of unsupervised partial physical custody in a public location. *Id.* at 10.

Significantly, Father last had contact with the Children in January 2017, due to an incident that took place in the parking lot of the Children's counseling office. *Id.* at 13-18. According to Mother, she was sitting in her vehicle when Father drove his vehicle into hers, pushing her "down an embankment through a fence and some trees." *Id.* at 16. Father then exited his vehicle and began yelling and striking Mother's driver's side window with a bat. *Id.* Mother fled from her vehicle and "hid in an office" while calling 911.[1] *Id.* As a result of this incident, Father was arrested and faced unspecified criminal charges. *Id.* at 21. He was ultimately convicted and received a sentence of incarceration

---

[1] The Children were inside the counseling office at the time of the incident. N.T., 6/4/19, at 17.

in February 2018.[2] *Id.* at 63. Meanwhile, Mother and Father agreed to modify the terms of their custody order to suspend all contact between Father and the Children. *Id.* at 31-32, 59. Mother also obtained a three-year Protection From Abuse ("PFA") order against Father, to which he agreed without admission of wrongdoing. *Id.* at 17-18, 33-34, 60. Like the custody order, the PFA order directed that Father could not have contact with the Children. *Id.* at 17.

The substance of this appeal focuses on what Father did, or did not do, to maintain his relationship with the Children following the incident in January 2017. After Father was arrested in January 2017, he spent two days in jail followed by either three days or "almost two weeks" in a hospital. *Id.* at 21, 62-63. However, Father posted bail and remained free until his sentencing in February 2018. *Id.* During the year that Father remained free, he did not request that the PFA court modify the order against him so that he could have contact with the Children.[3] Father explained that he agreed to the PFA order, and did not attempt to modify it later, due to the advice of his criminal defense counsel, who cautioned him that PFA proceedings could affect the outcome of

_____

[2] Father's maximum sentence expired on January 30, 2020. N.T., 6/4/19, at 57.

[3] This Court has explained that a trial court may not enter a custody order that conflicts with an existing PFA order. It is the PFA modification process "which may be utilized to determine whether a more liberal custody/visitation [o]rder may become operative." *Lawrence v. Bordner*, 907 A.2d 1109, 1113–14 (Pa. Super. 2006) (quoting *Dye for McCoy v. McCoy*, 621 A.2d 144, 145–46 (Pa. Super. 1993)).

his criminal matter. *Id.* at 51, 64. After Father's sentencing and incarceration in February 2018, he once again did not request modification of the PFA order. According to Father, he did not request modification because he suffers from dyslexia and cannot read or write. *Id.* at 43, 52-53. Father explained that he could not represent himself in a modification proceeding because the jail and prison facilities where he resided did not offer services to assist him with his illiteracy, and that he had been unable to afford private counsel. *Id.* at 66-69, 71-73.

On July 19, 2018, the Petitioners filed petitions to terminate Father's parental rights to the Children involuntarily.[4] The orphans' court conducted a hearing on June 4, 2019. Father retained private counsel to represent him during the hearing. He remained incarcerated at the time and participated via videoconference. Ultimately, the court entered a decree on August 5, 2019,

---

[4] Father filed a petition to modify the PFA order in February of 2019, after the Petitioners filed their termination petitions. N.T., 6/4/19, at 27, 35-36, 61-62. The PFA court did not grant Father contact with the Children. *Id.* at 61-62.

denying termination. The Petitioners timely filed notices of appeal, along with

concise statements of errors complained of on appeal, on August 30, 2019.[5],[6]

---

[5] On September 14, 2019, Father's privately-retained counsel filed a motion to withdraw in this Court. This Court denied the motion without prejudice to counsel's ability to request relief in the orphans' court. The record does not reveal that counsel filed a motion to withdraw in the orphans' court. Instead, counsel filed a second motion to withdraw in this Court on March 13, 2020. We must once again deny counsel's motion without prejudice to her ability to request relief in the orphans' court. Father has been proceeding in this matter *in forma pauperis* since October 2019, which suggests that he is indigent and entitled to court-appointed counsel. ***See In re Adoption of C.A.S.***, 166 A.3d 353, 356 (Pa. Super. 2017) ("Parents in involuntary termination proceedings have a constitutionally-protected right to counsel."). If counsel wishes to withdraw, she should file her motion in the orphans' court, so that the court may appoint new counsel for Father, assuming that he qualifies. While this memorandum affirms the decree denying the termination of Father's parental rights, it is important to note that his right to representation by counsel will continue if the Petitioners seek review of our decision with the Pennsylvania Supreme Court.

[6] The Petitioners' notices of appeal each included two docket numbers, one for each child. In a recent opinion, this Court quashed an appeal under somewhat similar circumstances, holding that the inclusion of multiple docket numbers in a single notice of appeal violated ***Commonwealth v. Walker***, 185 A.3d 969 (Pa. 2018), in which our Supreme Court directed that appellants must file separate notices of appeal whenever a single order resolves issues arising on more than one trial court docket. ***See Commonwealth v. Creese***, 216 A.3d 1142, 1144 (Pa. Super. 2019) ("We read our Supreme Court's decision in ***Walker*** as instructing that we may not accept a notice of appeal listing multiple docket numbers, even if those notices are included in the records of each case.").

We conclude that the matter at bar is distinguishable from ***Creese***. In ***Creese***, the appellant's notices of appeal each included four docket numbers. This Court noted that it was unclear whether the appellant had filed one notice of appeal, which the clerk of courts then photocopied several times, or whether the appellant had filed four separate notices of appeal. ***Id.*** at 1144 n.1. The Court also noted that the appeal had been divided into four separate captions administratively, which did not cure the defect. ***Id.*** at 1144 n.2.

The Petitioners now raise the following claim for our review:

Did the [orphans'] court abuse its discretion or commit an error of law in its August 2, 2019 [decree] by finding that the PFA order, Father's incarceration, reliance on counsel, dyslexia, and lack of financial means were reasonable excuses for his failure to perform parental duties in excess of six months and legitimate barriers supporting a denial of the [p]etitions to terminate his parental rights?

The Petitioners' Brief at 7.

We consider the Petitioners' claim pursuant to the following standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously

_____

Here, in his response to this Court's September 27, 2019 Rule to Show Cause order, the Petitioners' counsel averred that he filed separate notices of appeal, one for each of the Children, along with separate concise statements, transcript requests, proofs of service, and checks made payable to Register of Wills and this Court. The record supports counsel's averments, as it contains the documents he describes, each with a unique timestamp, and photocopies of two separate checks for each docket number. In addition, counsel included a divided caption on his notices of appeal, with each docket number appearing alone in a separate section of the caption with the relevant child's name. It is important to note that counsel's inclusion of the complete caption with both docket numbers did not create any risk of confusion or impede our appellate review. If anything, counsel's inclusion of the complete caption was helpful to this Court, in that it alerted us that the Petitioners filed two related appeals, which we could then consolidate *sua sponte*. Under the unique circumstances of this case, we discern no violation of **Walker**, and we decline to quash these appeals.

emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Section 2511 of the Adoption Act governs the involuntary termination of parental rights. ***See*** 23 Pa.C.S.A. § 2511. It requires a bifurcated analysis:

> . . . . Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

***In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In the instant matter, the Petitioners requested that the orphans' court terminate Father's parental rights pursuant to Section 2511(a)(1) and (b), which provides as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> ***

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

\*\*\*

23 Pa.C.S.A. § 2511(a)(1), (b).

Because the orphans' concluded that the Petitioners failed to meet their burden of proof with respect to Section 2511(a)(1), it did not proceed to an analysis of Section 2511(b).  Orphans' Court Opinion, 9/27/19, at 3; ***see also L.M.***, 923 A.2d at 511.  Therefore, we will limit our own analysis to Section 2511(a)(1) as well.

To satisfy the requirements of Section 2511(a)(1), "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." ***In re Z.S.W.***, 946 A.2d 726, 730 (Pa. Super. 2008).  The orphans' court must then consider the parent's explanation for his or her abandonment of the child, in addition to any post-abandonment contact.  ***Id.*** This Court has emphasized that a parent does not perform parental duties by displaying a merely passive interest in the development of a child.  ***In re***

***B.,N.M.***, 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied*, 872 A.2d 1200 (Pa. 2005) (quoting ***In re C.M.S.***, 832 A.2d 457, 462 (Pa. Super. 2003), *appeal denied*, 859 A.2d 767 (Pa. 2004)). Rather,

> [p]arental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

***Id.*** (citations omitted).

Of particular importance to this appeal, incarceration does not relieve a parent of the obligation to perform parental duties. Our case law does not require that an incarcerated parent "perform the impossible." ***Id.*** at 857. However, that parent must utilize the resources available in prison to preserve a relationship with his or her child. ***Id.*** at 855; ***see also In re Adoption of S.P.***, 47 A.3d 817, 828 (Pa. 2012) (discussing ***In re Adoption of McCray***, 331 A.2d 652 (Pa. 1975)).

Here, the Petitioners contend that the orphans' court erred by finding that Father faced "legitimate and reasonable barriers" that absolved him of his responsibility to perform parental duties. The Petitioners' Brief at 15. The Petitioners contend that Father took no action to overcome the barriers he faced, which he brought upon himself by engaging in criminal conduct. ***Id.*** at

14-16, 21. The Petitioners emphasize that Father agreed to the PFA order prohibiting contact with the Children following his assault of Mother in January 2017, and that he made no effort to request modification of the PFA order until after they filed their petitions to terminate his parental rights. *Id.* at 21-38.

The orphans' court explained its decision to deny termination of Father's parental rights as follows, in relevant part:

> Father explained that he entered into an agreement without admission of wrongdoing regarding the January 24, 2017 [PFA] [o]rder because he was advised by his counsel that if he contested Mother's [p]etition [for a] [PFA], Father would incriminate himself prior to his sentencing in his criminal case. Father further explained that subsequent to his sentencing and while he was incarcerated, he was not able to immediately file a [p]etition to [m]odify the [PFA] [o]rder in light of his dyslexia and his lack of financial means. Father was transferred to three (3) different prisons between February 1, 2018 and May 3, 2018.
>
> Furthermore, prior to the [PFA] [o]rder being filed by Mother in January of 2017, Father relied upon his fiancée to prepare his legal documents pertaining to custody, and he would simply sign his name to the legal documents. However, Father stated that once he was incarcerated, his fiancée was not able to give him any legal documents to sign while he was in prison.
>
> ***
>
> Therefore, while Father was incarcerated, Father was extremely limited in preparing documents on his own in light of his dyslexia, and not being able to secure counsel due to his lack of financial means.
>
> Father testified that his fiancé[e] was finally able to secure money from her tax refund in order to secure Father's counsel to modify the [PFA] [o]rder. Father was able to make payment arrangements with counsel, and a [p]etition to [m]odify the [PFA]

[o]rder was filed in 2019 subsequent to the filing of the petition to terminate his parental rights. . . .

. . . . Father's filing of the [p]etition to [m]odify the [PFA] [o]rder subsequent to the filing of the [p]etition to [t]erminate his parental rights was not considered by this Court as an effort made by Father. However, Father's actions bolsters [*sic*] Father's credibility in explaining his reasons for not filing the petition for modification earlier due to the impact it may have had on his criminal sentencing, his lack of finances, and his dyslexia.

***

This Court finds Father's explanation for his lack of contact with his minor children to be reasonable. This Court took into consideration the barriers which precluded Father from having contact with his children, i.e., the [PFA] [o]rder for three (3) years, Father's incarceration, Father's sentencing, Father's lack of financial means and Father's dyslexia.

Orphans' Court Opinion, 9/27/19, at 8-12 (citations omitted).

Our review of the record supports the decision of the orphans' court. As explained above, the Petitioners filed their termination petitions on July 19, 2018. Accordingly, the critical six-month period began on January 19, 2018, shortly before Father's incarceration on February 1, 2018. N.T., 6/4/19, at 65. Father testified that he intended to request modification of the PFA order immediately after he resolved his criminal matter. *Id.* at 52, 70. He explained that he had relied on the advice of his criminal defense counsel, who cautioned him that he should not request modification of the PFA order while the criminal matter remained pending. *Id.* at 51, 64, 70.

However, Father testified that the circumstances of his incarceration and his lack of financial means impeded his plans. Father stayed at three different

jail or prison facilities during the critical six-month period. *Id.* at 65-67. At each of those facilities, Father spoke with prison officials, informed them that he was illiterate, and inquired whether there were services available to assist him. *Id.* at 66-67, 71-73. Each time, the prison officials informed Father that there were no services available. *Id.* While Father conceded that he could have asked another inmate to assist him in requesting modification of the PFA order, he expressed concern that he would not have been able to trust another inmate. *Id.* at 73-74. He explained, "I would have to walk up to a complete stranger and give them all my information with me not knowing what they're incarcerated for. . . . What if he screws it up or vice versa?" *Id.*

Regarding his financial difficulties, Father testified that he did not have the funds to hire a private attorney to request modification of the PFA order immediately after his incarceration. *Id.* at 66-69, 77. He explained that his fiancée, A.S., attempted to call a pro bono legal services agency, but that the attorneys there "would not take my case without speaking to me directly." *Id.* at 69, 77. Father emphasized that he had only limited phone access at the start of his incarceration. *Id.* at 53, 69. At his second facility, Father had the opportunity to make only one fifteen-minute phone call per week. *Id.* at 69.

Without being able to read or write, and without the financial means to hire an attorney, Father's ability to request modification of the PFA order during his incarceration was extremely limited. Father testified that A.S. had assisted him in representing himself during his prior custody dispute with

Mother. *Id.* at 53. However, A.S. was unable to request modification on Father's behalf because he had not executed a power of attorney prior to his incarceration. *Id.* at 76. Father added that he could not execute a power of attorney after his incarceration because, "I would have to file the paperwork here somehow and then get it notarized and have her sign it and stuff like that, which I'm back to square one again 'cause I can't do the paperwork." *Id.* at 61. Father also blamed prison policies, which he maintained would have prevented A.S. from providing him with the necessary paperwork. *Id.* at 67-68, 74. Ultimately, Father obtained a private attorney after the Petitioners filed their termination petitions. *Id.* at 68. Father explained that A.S. "called around until she found an attorney who would take payment arrangements and wait until she got her income tax." *Id.*

Thus, the record indicates that Father faced significant obstacles during the critical six-month period, which prevented him from performing parental duties on behalf of the Children. Father was unable to contact the Children due to the PFA order against him, and he was unable to request modification of the PFA order due to his incarceration, dyslexia, and lack of financial means. Father made efforts to overcome those obstacles by inquiring about possible services to assist him in filing a *pro se* PFA modification petition at his jail and prison facilities, and by working with his fiancée, A.S., to seek out an attorney. While Father's efforts were ultimately unsuccessful, it was within the discretion of the orphans' court to conclude that they were reasonable and sufficient to

demonstrate the "good faith interest and effort" that our law requires pursuant to Section 2511(a)(1).  **_B.,N.M._**, 856 A.2d at 855.

Based on the foregoing analysis, we conclude that the orphans' court did not abuse its discretion or commit an error of law by denying the petitions to terminate Father's parental rights to the Children involuntarily.  Therefore, we affirm the court's August 5, 2019 decree.

Decree affirmed.  Counsel's motion to withdraw representation denied without prejudice to her ability to request relief in the orphans' court.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/28/2020