**In re: B.,N.M.**

**Appeal of: B.,L.**

Superior Court of Pennsylvania.

Argued Aug. 9, 2004.

Filed Aug. 9, 2004.

---

Terrance M. Ging, Pittsburgh, for appellant.

John R. Kardos, Jr., Pittsburgh, for Q., G.A., appellee.

Raymond N. Sanchas, Pittsburgh, for B., N.M., appellee.

Before: HUDOCK, GANTMAN, and POPOVICH, J.J.

OPINION BY GANTMAN, J.:

¶ 1 Appellant, B.,L. ("Mother"), asks us to determine whether the parental rights of Appellee, Q.,G.A. ("Father") should have been involuntarily terminated, where Mother's petition for the involuntary termination under 23 Pa.C.S.A. § 2511(a)(1) was supported by competent evidence. After careful review of the pertinent law as applied to the facts herein, we hold the evidence presented was sufficient to support Mother's petition for involuntary termination of Father's parental rights under Section 2511(a)(1). Accordingly, we reverse the trial court's order denying the petition, and remand with instructions for consideration of the effect of termination on the needs and welfare of the child pursuant to Section 2511(b).

¶ 2 The relevant facts and procedural history of this case are as follows. B.,N.M. ("Child") was born December 19, 1992, the biological child of Mother and Father. The parties were never married. Six months prior to Child's birth, Father was arrested on June 10, 1992 and sentenced to thirteen (13) to thirty-five (35) years' incarceration with the possibility of parole in 2005. Mother brought Child to visit Father in prison once in 1993 and once in 1994. She then discontinued the visits, and Father has not seen Child since she was less than two years old. Father voluntarily acknowledged paternity in 1994. During the early years of Child's life, Mother and Father remained in contact through occasional letters and phone calls. If requested, Mother provided Father with photographs and information about Child. Father sent Child a Christmas gift when she was about two years old. Although Mother did not tell Child about these communications, Child was aware of the existence of her biological father. Father's efforts to contact Child were solely through Mother.

¶ 3 Mother and her current spouse began dating in 1994. In August 1998, they purchased a home and moved to another community within the state. Mother provided Father with a change of address but no telephone number, which was subsequently listed in the telephone book under Mother's name. She had mail forwarded to her new address. About this time, Mother stopped sending pictures and updating Father on Child's life. On May 20, 2000, Mother married her current spouse.

¶ 4 From 1998 to 2000, Father sent occasional correspondence to Mother and once arranged for a Christmas present to be sent through a church organization that assists incarcerated parents. During this two-year period, Father did not attempt to call Mother. Father testified he did not have Mother's new phone number and had no access to a phone directory in prison. However, in late 2001, approximately three years after Mother changed her residence, he was able to ask his cellmate's family to find the listing in the phone book for him. He then placed the number on his approved prison calling list on January 9, 2002.

¶ 5 Father stopped communicating with Mother and Child from the summer of 2000 through January 2002. Significantly, from the time of Child's birth until January 2002, Father admitted he did not seek help from relatives, friends or through legal action to enforce his right to child visitation. He claimed he was unable to provide financial support to Child. In summary, the record indicates the following events occurred prior to Father's

learning that his parental rights to Child might be threatened:

- 06/10/92 — Father incarcerated for 13–35 years
- 12/19/92 — Child born
- 1992 — Father gets photos of Child from Mother
- 1993 — Father sees Child once
- 1994 — Father sees Child once
- 1994 — Father sends gift to Child
- 1994 — Father stops hearing from Mother
- 1992-1998 — Father alleges bi-weekly letters, calls
- 1992-1998 — Mother alleges sporadic contact only
- 1998 — Mother moves
- 1998-2000 — Father sends sporadic letters to Mother
- 1998-2000 — Father sends Christmas gift to Child
- 05/20/00 — Mother marries
- 2000-2002 — Father ceases all communication
- 01/09/02 — Father calls Mother's home; no answer

¶ 6 Mother's attorney sent Father a letter on January 10, 2002, requesting Father's consent to termination of his parental rights so that Child could be legally adopted by Mother's husband. Father rejected the request by letter dated January 15, 2002. Father reinstituted efforts to contact Mother through frequent calls and letters until approximately May 2002. Father alleged he made two attempts to mail a Complaint for Visitation to Family Court, both of which were returned for incorrect addresses. His third attempt, on June 10, 2002, was not returned to him so he assumed the letter was correctly addressed. However, he claimed the court did not respond.[1] Seven and one half months later, on January 29, 2003, Father allegedly sent a letter to Family Court inquiring whether his Complaint for Visitation had been received and processed with a case number.[2] He claimed the court did not respond to this letter. From approximately May 2002 through January 2003, Father made no further contact with Mother or Child.

¶ 7 Petitions for involuntary termination of Father's parental rights and for adoption of Child were filed by Mother and her husband in Orphans' court on March 14, 2003.[3] Father contested the petitions, applied for *in forma pauperis* status, and was appointed counsel on March 14, 2003. The Orphans' court also set hearing dates for the termination and adoption petitions, and appointed counsel for Child.

¶ 8 At the termination hearing on April 23, 2003, Mother testified that Father sent letters and called approximately every two months during the first year of Child's life. After the two visits with Father, Mother stopped taking Child to see him because Child did not want to go. On cross-examination, Mother conceded that Child was less than two years old when she ceased

1. We note evidence of this Complaint does not appear in the certified record.

2. This letter does not appear in the certified record.

3. There is some discrepancy as to the filing date of these petitions. They may have been filed as early as January 21, 2003. (See trial brief of guardian *ad litem* for Child) Certified docket entries indicate on February 19, 2003, the Orphan's court issued a preliminary decree setting a hearing date on the termination petition for April 9, 2003. Father testified he received notice of the termination petition on February 26, 2003. (N.T., 4/23/03, at 92) The actual petition in the record, however, is date stamped March 14, 2003.

visitations at the prison, and it was Mother who did not want to continue them. (*Id.* at 20). Mother stated Father's attempts to communicate with Child were inconsistent; he sent cards for about half of Child's birthdays, no birthday gifts, and rarely sent Christmas cards. She acknowledged that she routinely responded to Father's letters until approximately 1998 when she stopped communicating with him. She had spoken to Child about Father, but did not show her any of his correspondence. Father provided no financial support. (*Id.* at 15). Other than requesting photographs of Child, he did not inquire about her progress in general or school performance in particular. Father stopped communicating with Mother from the summer of 2000 until January 2002 when Mother requested he consent to terminate his parental rights. (*Id.* at 26). Mother testified her husband has fulfilled the role of parent to Child, providing emotional and financial support, helping with homework and other school-related activities, and including Child in holiday gatherings with his family. Child refers to him as "Dad." (*Id.* at 16–17).

¶ 9 Father testified that he tried to maintain contact with Child despite his incarceration. Though he wished Mother and Child would visit, he settled for phone contact and letters when Mother ceased bringing Child to prison. (*Id.* at 63). It was difficult to converse with Child over the phone when she was very young, so Father settled on direct communication with Mother. Mother sent him letters and pictures of Child until she was approximately four years old. Father testified that he called and wrote to Mother approximately every two weeks until 1998, when she moved to a new address. (*Id.*) He was uncertain how frequently he had sent birthday and Christmas cards throughout Child's life, or whether she received any of his correspondence.[4] (*Id.* at 64). He thought he had arranged for Christmas presents to be sent through a church several times and once asked a friend to send Child a birthday present, though he could not confirm whether she received these gifts. He claimed he was unable to support Child financially while incarcerated, and could not ask his family for help.

¶ 10 Father stated he drastically reduced his contact with Mother after she moved because he felt it was in his best interest to allow Mother time to establish her new family life, so that she might be more receptive to him if he tried to reestablish contact at a later time. (*Id.* at 68). Father knew that Mother would not facilitate contact with Child, but chose not to utilize legal resources available to him in prison, or personal contacts outside of prison, for help to establish visitation with or legal custody of Child. (*Id.* at 98). Thus, for seven years of Child's life, from 1994 until 2002, Father allowed himself to remain uninformed as to what legal options were available to him as a noncustodial parent. (*Id.* at 86). Father admitted he did not want to interfere with Child's stable family life; he felt he could be positive for Child in some small respect, as long as she was aware of him as her biological father. (*Id.* at 86). Father took no part in any decision-making during Child's life, relying on Mother to determine whether he would be part of Child's life. (*Id.* at 90).

¶ 11 Father called Mother when he received notice of her intent to pursue adoption of Child by her husband. He informed her that he did not mind if her husband became Child's legal guardian or

4. Prisoners receive ten free envelopes per month. Alternatively, a cash slip may be used which is copied for the prisoner and appears on a monthly account statement; letters may also be sent via certified or registered mail. (*Id.* at 74).

if Child took his last name as her own, as long as Father could retain a legal right to see Child when he was released from prison.[5] He did not inquire about Child during this conversation, though it had been close to two years since he last contacted Mother. (*Id.* at 72). Father mailed letters to various organizations requesting legal advice and assistance, but thought it was inappropriate for him to play a role in Child's life until he had a chance to be free when he became eligible for parole in two years time. (*Id.* at 85). Father acknowledged it was Mother's husband who had fulfilled the parental role in raising Child, but he was not willing to forego his legal right to see Child in the future. (*Id.* at 107).

¶ 12 Mother's husband testified that he had almost daily interaction with Child since she was two years old, when he began dating Mother. He was involved in caring for her physical, emotional and financial needs. He had been saving money for Child in a college fund. (*Id.* at 47). All of Child's birthdays and holidays had been spent together with both Mother's and his extended families. Child referred to him as "dad," and to his parents as "grandma and grandpa." A primary consideration for the move in 1998 was to purchase a home in a good school district for Child. (*Id.*) He testified that he was not aware of attempts by Father to acquire visitation rights to Child, though he knew Father sent letters and called Mother at various times. He stated Father made no contact for approximately one and a half years prior to Father's receipt of the letter requesting him to consent to termination of his parental rights. (*Id.* at 49).

¶ 13 The trial court denied Mother's petition to involuntarily terminate Father's parental rights by order dated July 31, 2003. The court refused to find statutory grounds for termination under Section 2511(a)(1). Accordingly, the court did not examine the facts presented with regard to Section 2511(b). (*See* Trial Court Opinion, dated July 31, 2003, at 9.) Mother timely appealed.

¶ 14 On appeal, Mother presents us with the following issue for our review:

WHETHER THE PARENTAL RIGHTS OF [FATHER] SHOULD BE TERMINATED UNDER 23 Pa.C.S.A. § 2511(a)(1) OF THE ADOPTION ACT.

(Mother's Brief at 4).[6]

¶ 15 In appeals involving involuntary termination of parental rights, we employ a broad, comprehensive review of the record to determine whether the trial court's decision is supported by competent evidence. *In the Matter of: B.L.W.,* 843 A.2d 380, 383 (Pa.Super.2004) (internal citation omitted). The court's resolution of its evidentiary conflicts will not be disturbed unless they lack support in the record or represent an abuse of discretion or error of law. *In the Interest of A.L.D., Jr., supra* at 338. An abuse of discretion occurs when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will. *In re Adoption of Atencio,* 539 Pa. 161, 165 n. 3, 650 A.2d 1064, 1066 n. 3 (1994) (internal citation omitted).

¶ 16 Mother argues the evidence clearly supported termination of Father's parental

---

5. Child's current last name, as it appears on her birth certificate, is Mother's maiden name. *See* Petition for Adoption, 3/14/03.

6. Preliminarily we note Mother's appeal is properly before us as all decrees in termination of parental rights cases are final, appealable orders. *In the Interest of A.L.D., Jr.,* 797 A.2d 326, 335 (Pa.Super.2002).

rights under Section 2511(a)(1) because Father failed to perform parental duties or had evidenced a purpose of relinquishing parental claim to Child in excess of six months prior to the filing of the petition for involuntary termination of his parental rights. Father had no personal contact with Child since she was two years old, and failed to provide educational, emotional or financial support. He sent sporadic cards and gifts to Child over a period of approximately ten years since her birth. Father had virtually no contact with Mother or Child for four years between 1998 and 2002. Even after Mother requested his consent to the termination of his parental rights, Father failed to act to establish a parental relationship with Child. Although he allegedly mailed a Complaint for Visitation to the court, he waited seven and one half months to inquire as to why he received no response. Father did not contact Mother or Child for six months prior to the filing of the involuntary termination petition, and admitted in testimony that he did not want to interfere in Child's stable life. Thus, Mother submits Father failed to take the affirmative steps necessary to assert his parental role as the natural father of Child. Additionally, Mother contends the evidence makes clear, termination of Father's parental rights would best serve Child's needs and welfare under Section 2511(b). Mother and her husband have raised Child together for most of her life, consistently providing the developmental, physical and emotional support Child requires. Mother concludes the Orphan's court erred in refusing to find Mother had satisfied the requirements to terminate Father's parental rights under Section 2511(a)(1). We agree.

¶ 17 The following statutory language governs termination of Father's parental rights in this case:

§ 2511. Grounds for involuntary termination

(a) General Rule.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

\*     \*     \*     \*     \*     \*

(b) Other considerations.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

\*     \*     \*     \*     \*     \*

23 Pa.C.S.A § 2511(a)(1); (b); *In the Interest of C.S.*, 761 A.2d 1197, 1201 (Pa.Super.2000). In an involuntary termination of parental rights proceeding, the burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for termination. *In re Adoption of Atencio, supra* at 166, 1066 (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). The focus of the termination proceeding is on the conduct of the parent and whether his conduct

justifies termination of parental rights. *In re B.L.L.*, 787 A.2d 1007, 1013 (Pa.Super.2001) (internal citation omitted); *In re Child M.*, 452 Pa.Super. 230, 681 A.2d 793, 797 (1996), *appeal denied,* 546 Pa. 674, 686 A.2d 1307 (1996). Although it is the six months immediately preceding the filing of the petition that is most critical to the analysis, the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. *In re D.J.S.*, 737 A.2d 283, 286 (Pa.Super.1999) (internal citations omitted). The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination. *Id.* at 285.

¶ 18 The Supreme Court has defined parental duty as follows:

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent 'exert himself to take and maintain a place of importance in the child's life'.

*In re C.M.S.*, 832 A.2d 457, 462 (Pa.Super.2003) (citing *In re Burns*, 474 Pa. 615, 379 A.2d 535 (1977)). *See In re: G.P.-R.*, 851 A.2d 967, 976, (2004) (internal citation omitted). Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. *In re Adoption of Dale A., II*, 453 Pa.Super. 106, 683 A.2d 297, 302 (1996) (internal citations omitted). A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. *In re C.M.S., supra* at 462 (citing *In re Shives*, 363 Pa.Super. 225, 525 A.2d 801 (1987)). Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs. *In re D.J.S., supra* at 287

¶ 19 Where a parent is incarcerated, the fact of incarceration does not, in itself, provide grounds for the termination of parental rights. *Id.* at 286. However, a parent's responsibilities are not tolled during incarceration. *Id.* The focus is on whether the parent utilized resources available while in prison to maintain a relationship with his or her child. *In re the Adoption of Dale, A., II, supra* at 302. An incarcerated parent is expected to utilize all available resources to foster a continuing close relationship with his or her children. *In the Interest of A.P.*, 692 A.2d 240, 245 (Pa.Super.1997) (internal citation omitted).

¶ 20 Where a non-custodial parent is facing termination of his or her parental rights, the court must consider the non-custodial parent's explanation, if any, for the apparent neglect, including situations in which a custodial parent has deliberately created obstacles and has by

devious means erected barriers intended to impede free communication and regular association between the non-custodial parent and his or her child. *In re C.M.S.*, *supra* at 463 (quoting *In re Shives*, *supra* at 803). Although a parent is not required to perform the impossible, he must act affirmatively to maintain his relationship with his child, even in difficult circumstances. *In re: G.P.-R.*, *supra* (internal citation omitted). A parent has the duty to exert himself, to take and maintain a place of importance in the child's life. *Id.*

¶ 21 Thus, a parent's basic constitutional right to the custody and rearing of his or her child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment. *In the Matter of B.L.W.*, *supra* at 388 (internal citations omitted). A parent cannot protect his parental rights by merely stating that he does not wish to have his rights terminated. *In re C.M.S.*, *supra* at 464 (internal citation omitted).

¶ 22 In the instant case, Mother's attorney wrote to Father in January 2002 and asked Father to voluntarily relinquish his parental rights, so that Child could be adopted by Mother's husband. Father refused. In response, Father reinstituted his efforts to establish a relationship with Child through letters and calls to Mother. The record, however, demonstrates Father stopped communicating after May 2002, more than eight months prior to the filing of the involuntary termination petition. Though Father claimed he mailed a Complaint for Visitation to the Orphan's court in June 2002, he sat idle for seven and one half months before inquiring as to the status of the complaint. Even when faced with the possibility that his parental rights might be terminated, Father failed to act with reasonable firmness to pursue his right to visitation. Father failed to maintain contact with Child and failed in all respects to perform any parental duties with regard to Child for at least six months prior to the filing of the involuntary termination petition in March 2003.

¶ 23 Father explained that Mother prevented him from developing a relationship with Child when she ceased visitations and prevented his communication with Child. The trial court found Mother's conscious decision to keep Father out of Child's life was an obstacle which Father, despite his efforts, could not overcome. However, the court stopped short of a full analysis of Father's conduct under the totality of the circumstances. The court focused improperly on Mother's actions, and failed to consider Father's obligation to take affirmative steps to overcome the purported obstacles which prevented him from establishing a close relationship with Child. Father had a duty to exert himself, to take and maintain a place of importance in Child's life. *See In re: G.P.-R.*, *supra.*

¶ 24 Furthermore, Father's actions were not proactive for most of Child's life, and he offered insufficient excuses to explain his inaction. He consistently pointed to external circumstances which kept him from performing his parental role toward Child. He claims his ignorance of the law prevented him from taking any legal action to establish visitation with Child until his parental rights were threatened. When he finally wrote to the Orphan's court in June 2002 seeking visitation rights, he claimed the court did not respond to his letter. He could not explain, however, why he sat idle for seven and one half months before sending a follow-up letter, even though he had access to postage during that time. Father insisted he failed to seek assistance from prison counselors, social service agencies, family members or friends to help him establish a consistent, meaningful

bond with Child, because he did not believe these efforts would be successful. He claimed he was unable to call Mother or Child after they moved because Mother did not provide him with the new telephone number, although it was listed. Father then said he did not have access to a phone directory in prison. Shortly thereafter, Father wrote to Mother asking for her number, but when she did not respond, he waited three years before asking his cellmate's family to obtain the phone number from a directory outside of prison. Father concedes his lack of consistent contact was due to the fact that he knew Child was growing up in a stable family situation, and he thought he should wait until Mother felt it was appropriate for him to see Child. (*See* N.T. at 86). Though Father was not required to perform the impossible, he was obligated to act affirmatively to maintain his relationship with Child, even in difficult circumstances. We conclude Father failed to act to the best of his ability to meet his obligation despite his incarceration and the obstacles Mother placed before him. *See In the Interest of A.P., supra.*

¶ 25 The trial court relied on *In re Baby Boy H.,* 401 Pa.Super. 530, 585 A.2d 1054 (1991) in concluding Father's failure to perform parental duties resulted from Mother's obstructive tactics, and such failure was thus excused. In that case, the mother and father were living together prior to the child's birth. When the mother became pregnant, the father offered to get married or, alternatively, to support the child. The mother told him she had miscarried, and subsequently placed the child with an adoption agency without the father's knowledge. The agency placed the child in foster care and contacted the father to ask if he would relinquish his parental rights. He objected, sought and won partial custody of the child. The father visited the child initially, but when he was given information by a friend leading him to question the paternity of the child, he ceased visiting. He then requested blood tests, which confirmed him as the father. The foster parents refused to release the child to the custody of the father, and filed a petition seeking termination of the parental rights of both the father and the mother. The father contested the action. The trial court dismissed the petition, and petitioners appealed. This Court affirmed, concluding the father acted with reasonable firmness in overcoming the obstacles placed by the mother and the agency. *See In re Adoption of C.M.W,* 412 Pa.Super. 360, 603 A.2d 622 (1992) (where father did not see child for more than one year because mother failed to notify father she married, changed name, moved with child from county, and obtained unlisted address, this Court reversed trial court's grant of mother's petition for involuntary termination of father's parental rights, holding father's attempts to locate child through mother's relatives, Domestic Relations Office, IRS and petition for visitation were reasonable, though unsuccessful, attempts to overcome mother's obstacles).

¶ 26 In the case of *In re C.M.S., supra,* this Court reversed the Orphan's court denial of the prospective adoptive parents' petition for the involuntary termination of the father's parental rights, holding that evidence established the father showed a settled purpose of relinquishing his parental rights. The child's parents were unmarried and did not reside together. During her pregnancy, the mother began arranging for the child's adoption without informing the father. The father had no contact with the child after one visit to the hospital following the child's birth in 2001. The mother and an intermediary created a deception to prevent the father from learning of the child's whereabouts and the status of the adoption. Approximately

ten days after the child was born, the father became aware of the actual situation, but he was called for military duty for a period of two weeks. While on duty, he was advised that he would be notified by mail if adoption proceedings were to go forward. Upon his return, he contacted the intermediary who refused to give him the child's location, but informed him that the mother was proceeding with the adoption. Father took no further action until he received the adoption papers fourteen months later. He continued to have contact with the mother, but did not attempt legal action to gain custody or visitation of the child. Thus, the court held the father failed to use resources available to persist in attempting to assert his rights; despite the mother's deceptions, the father failed to take action to overcome the obstacles she had created. *Id.* at 464. "His nonaction cannot be rationalized by his assertion that he did not know the whereabouts of his child so he could not do anything." *Id.*

¶ 27 Here, Father's actions are substantially similar to those of the father in the case of *In re C.M.S., supra*. The certified record reveals Father initiated no action to assert his parental rights to Child until faced with losing his legal status as her natural father. There is nothing in the record which indicates a change in Father's prison circumstances that made it possible for him to educate himself as to his legal rights in 2002, whereas previously he was unable to do so. Mother's behavior did not prevent Father from using reasonable firmness to pursue alternative possibilities for maintaining contact with his daughter. When Mother moved to another location and immediately provided Father with her new address, he waited three years to obtain the phone number, which was listed. Though he did not have access to a phone directory in prison, he did have access to other means for getting the phone number. Sporadic cards or gifts during Child's life did not fulfill Father's role as a parent. He failed to seek help from sources other than Mother to try to see Child, acquire photographs of her, or obtain copies of her report cards. From 1994, when Mother ceased visitations, until 2002 when she asked him to voluntarily terminate his rights, Father did little more than occasionally try to contact Child through Mother, who was not facilitating the relationship. From 1998 until 2002, Father had virtually no contact with Mother or Child. Moreover, Father's initial attempts to reestablish a relationship with Child in early 2002 were insufficient because he did virtually nothing from June 2002 until the formal petition for involuntary termination of his parental rights was filed in Orphan's court in March 2003.

¶ 28 Upon careful and independent review of the record, we conclude evidence clearly established that Father showed a settled purpose of relinquishing his parental rights. He sat idle for most of Child's life, allowing Mother and her spouse to perform all parental duties. Father could not preserve his parental rights by waiting for a more suitable or convenient time to perform his parental responsibilities, while Mother and her husband fulfilled Child's immediate physical and emotional needs. *See In re C.M.S., supra* at 462 (internal citation omitted).

¶ 29 Moreover, Father stated he opposed the termination because he "wanted to retain a legal foothold, my legal right to see [Child] when I got out." (N.T. at 72). Merely stating that he did not wish to have his parental rights terminated was insufficient to protect those rights without acting affirmatively to foster a parental relationship with Child during his incarceration. *In re C.M.S., supra* at 464 (internal citation omitted). We consider Father's

position as disingenuous, where we see little indication in the record of a proactive desire to take on the role of a parent in Child's life. Therefore, we hold Mother presented clear and convincing evidence of grounds for termination of Father's parental rights under the statutory standard of Section 2511(a)(1). Thus, we reverse the Orphan's court decision.

¶ 30 The final consideration is whether the needs and welfare of Child will be met by termination of Father's parental rights pursuant to Section 2511(b). The needs and welfare of a child are essential considerations but bifurcated from and not relevant to the proof of the statutory requirement for termination of parental rights, which must be established before the child's needs and welfare are considered. *In re B.L.L., supra* at 1014. The trial court made no findings pursuant to Section 2511(b), having denied the termination petition under Section 2511(a)(1). On remand, the court must carefully consider the tangible dimension, as well as the intangible dimension-the love, comfort, security, and closeness-entailed in a parent-child relationship. *In re Adoption of T.B.B.,* 835 A.2d 387, 397 (Pa.Super.2003); *In the Interest of C.S., supra* at 1202. The court must consider whether a bond exists between Child and Father, and whether termination would destroy an existing, necessary and beneficial relationship. *Id.* The court shall not consider, however, any efforts by Father which are first initiated subsequent to the giving of notice of the filing of the petition. *See* 23 Pa.S.C.A. § 2511(b).

¶ 31 In consideration of Section 2511(b), we instruct the trial court to carefully consider the certified record which reflects Father was incarcerated prior to Child's birth, has had no oral or face-to-face contact with Child since she was less than two years old, and has not been a participant in raising Child. Father conceded he re-

duced contact with Mother to allow Mother to establish her new life. (N.T. at 68). Father did not utilize the legal arena to foster a relationship with Child. (*Id.* at 98). Father acknowledged Mother's husband has fulfilled the parental role in raising Child. (*Id.* at 107). Furthermore, Child has consistently lived with Mother and Mother's husband. Mother's husband testified he has had daily interaction with Child, and has celebrated all of Child's birthdays with her. Child referred to him as "dad," and to his parents as "grandparents. He and Mother purchased a home in 1998 so that Child could attend school in a good school district. (*Id.* at 47). Although Child is aware of Father's existence, she does not know him as her parent. In fact, Child is with the only parents she has known throughout her life. Finally, Child's guardian *ad litem* supports termination of Father's parental rights so that Child may be adopted by the person who has essentially been her father for most of her life. Child's needs and welfare are being served by her present situation.

¶ 32 We hold the evidence presented was sufficient to support Mother's petition for involuntary termination of Father's parental rights under Section 2511(a)(1). Based upon our determination that Mother satisfied her burden under Section 2511(a), we reverse the trial court's order denying the termination petition and remand for a hearing and subsequent findings as to the effect of termination on the needs and welfare of Child under Section 2511(b).

¶ 33 Order reversed. Case remanded for proceedings consistent with this opinion. Jurisdiction is relinquished.

¶ 34 *Judge HUDOCK concurs in the result.