J-S14020-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: INVOLUNTARY TERMINATION OF: A.E.S. | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.K., FATHER | : : : : : | |
| | : | No. 40 MDA 2021 |

Appeal from the Decree Entered December 2, 2020
In the Court of Common Pleas of Lebanon County Orphans' Court at
No(s):  2020-00555

BEFORE:  BOWES, J., DUBOW, J., and MUSMANNO, J.

MEMORANDUM BY DUBOW, J.:          **FILED: JUNE 14, 2021**

Appellant, J.K. ("Father"), appeals from the December 2, 2020 Decree that involuntarily terminated his parental rights to A.E.S. ("Child").  Upon careful review, we affirm.

**FACTUAL AND PROCEDURAL HISTORY**

The relevant factual and procedural history is as follows.  Father and A.S. ("Mother") are the biological parents of Child.  When Child was born in December 2018, Mother was seventeen years old and living with her parents ("Maternal Grandmother" and "Maternal Grandfather;" collectively, "Maternal Grandparents").  The Lebanon County Children and Youth Services (the "Agency") had an open case involving minor Mother and Maternal Grandparents over concerns about inappropriate housing conditions and continuing lice infestation.

As a newborn, Child had ongoing issues with feeding and weight gain. Hospital staff admitted three-month-old Child to the hospital for monitoring and, after she gained a satisfactory amount of weight, discharged her five days later. The following week, after a medical appointment, Child was transported to the hospital via ambulance due to her failure to gain weight. Hospital staff once again admitted Child to the hospital for monitoring. Later that day, Mother and Maternal Grandfather attempted to sign Child out of the hospital against medical advice, prompting hospital staff to take emergency custody of Child to ensure her medical needs were met. On March 19, 2019, the Agency obtained emergency custody of Child and placed her in foster care upon her release from the hospital. Mother initially refused to disclose Father's name to the Agency, but eventually revealed his identity. Father lives with Mother and Maternal Grandparents in the Maternal Grandparent's home.

On May 7, 2019, after numerous continuances, the trial court adjudicated Child dependent and the court ordered Child to remain in foster care. The trial court ordered Father to maintain a safe and sanitary home for Child, allow the Agency to conduct both announced and unannounced home visits, maintain consistent visits with Child, obtain a mental health evaluation, maintain suitable employment, and pay child support. On September 1, 2020, after Child had been in placement for approximately eighteen months, the Agency filed a Petition to Involuntarily Terminate Mother's and Father's Parental Rights to Child ("TPR Petition").

On December 1, 2020, the trial court held a hearing on the Agency's TPR Petition. The Agency presented testimony from caseworker Tabitha Belsak. Father chose not to testify.

In sum, Ms. Belsak testified that Father lived with Mother and Maternal Grandparents in Maternal Grandparent's home, and the housing continued to be inappropriate. Ms. Belsak stated that the home was cluttered with clothing and stacked boxes and drinks in Child's playpen, had loose and exposed wiring on the floor, had medication bottles in open areas throughout the house, had garbage bags and used cigarettes throughout the house, and was unsanitary due to the household members not properly caring for numerous cats, dogs, and turtles that lived in the home and generated feces and urine throughout. N.T. TPR Hearing, 12/1/20, at 15-21. Ms. Belsak testified that, although the Agency provided numerous services to the family, the family was often uncooperative, and the home conditions only improved temporarily. *Id.* at 18-20.

Ms. Belsak stated that the family was also uncooperative with unannounced home visits; out of ten unannounced visits she was only granted access to the home on two occasions. *Id.* at 30. She described an unannounced home visit on June 26, 2020, when she observed unsanitary conditions, including "close to 20 to 30 cats in the home[,]" saw a family friend hiding in the corner of a room, and a Pit Bull dog locked and chained in the upstairs bathroom; smelled cigarette smoke, cat urine and feces, and another

"unidentifiable foul smell[;]" and was unable to gain access to Mother and Father's bedroom because it was locked. *Id.* at 38-39.

Ms. Belsak informed the court that Father failed to provide a mental health evaluation to the Agency until after the Agency filed the TPR Petition, failed to pay child support consistently, and failed to provide proof of ongoing employment. *Id.* at 55, 62, 66-67. Specifically, Father signed releases for the Agency to contact two alleged employers; one employer had no record of Father working there and the second employer fired Father because he did not show up for scheduled work shifts. *Id.* 64. Ms. Belsak testified that Father claimed to work for four additional employers but refused to sign releases for the Agency to verify his employment. *Id.*

Regarding visitation, Ms. Belsak testified that out of approximately 100 to 110 supervised visits, Father was late, unprepared, or absent for 37 visits. *Id.* at 52. Specifically, Father showed up late to 22 visits, missed 4 visits, cancelled 3 visits, and did not have formula or clean bottles for Child during 8 visits. *Id.* at 52-54.

Ms. Belsak confirmed that she supervises twice-a-week visits between Father and Child and observed that Child favors contact with Mother but interacts with both parents. *Id.* at 76. Ms. Belchak witnessed that Father was sometimes verbally aggressive with Child and yelled at Child during visits, causing Child to look frightened. *Id.* 76-77. Ms. Belsak testified that parents and Child "definitely are bonded." *Id.* at 77. She continued, "[h]owever, due to [Child's] age and due to the adoptive resource being someone she already

knows, I don't believe the effect of severing the bond would be detrimental."

*Id.* at 77.

On December 2, 2020, the trial court entered a Decree terminating Father's parental rights to Child.[1,2] Father timely appealed. Both Father and the trial court complied with Pa.R.A.P. 1925.

## ISSUE RAISED ON APPEAL

Father raises the following issue for our review:

Whether the trial court erred when it entered an Order on December 1, 2020 terminating [Father]'s parental rights, especially in light of the competent evidence regarding [Child] being bonded with him?

Father's Br. at 5 (some capitalization omitted).

## LEGAL ANALYSIS

When we review a trial court's decision to grant or deny a petition to involuntarily terminate parental rights, we must accept the findings of fact and credibility determinations of the trial court if the record supports them. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id*. (citation omitted). "Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009)

---

[1] The trial court also entered a Decree terminating Mother's parental rights to Child. Mother is not a party to this appeal.

[2] Child's legal counsel and guardian *ad litem* both agree that Father's parental rights should be terminated.

(citation omitted). We may not reverse merely because the record could support a different result. *In re T.S.M.*, 71 A.3d at 267. We give great deference to the trial courts "that often have first-hand observations of the parties spanning multiple hearings." *Id.* Moreover, "[t]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted).

Section 2511 of the Adoption Act governs termination of parental rights, and requires a bifurcated analysis. 23 Pa.C.S. § 2511. "Initially, the focus is on the conduct of the parent." *In re Adoption of A.C.*, 162 A.3d 1123, 1128 (Pa. Super. 2017) (citation omitted). "The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a)." *Id.* (citation omitted). If the court determines that the parent's conduct warrants termination of his or her parental rights, the court then engages in "the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." *Id.* (citation omitted). Notably, we need only agree with the trial court's decision as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm the termination of parental rights. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

In his sole issue on appeal, Father avers that the Agency failed to provide clear and convincing evidence to terminate his parental rights under

Section 2511, generally. Father's Br. at 5, 9. Father argues that Maternal Grandparents maintained control of the home, leaving Father powerless to improve the home conditions or allow the Agency access to the home. *Id.* at 12-13. Therefore, Father contends, he was penalized for the behavior of the Maternal Grandparents. *Id.* Father concedes that he did not obtain a mental health evaluation, find employment, or pay child support due to his exhibited "immature, lackadaisical attitude[.]" *Id.* at 14 (quoting Trial Ct. Op., filed 1/15/21, at 13). However, Father argues he "should not be penalized for his emotional inability to complete the tasks." *Id.* Finally, Father makes a bald averment, without citation to the record, that the trial court abused its discretion in terminating his parental rights because severing the Child's bond with Father would have a detrimental effect on Child. *Id.* Father's arguments lack merit.

**Termination Pursuant to 23 Pa.C.S. § 2511(a)(1)**

Upon review, we conclude that the Agency presented clear and convincing evidence to terminate Father's parental rights pursuant to Section 2511(a)(1). Section 2511(a)(1) provides that the trial court may terminate parental rights if the Petitioner establishes that "[t]he parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." 23 Pa.C.S. § 2511(a)(1). The focus of involuntary termination proceedings is on the conduct of the parent and whether that conduct justifies a termination of

parental rights. *In re B.L.L.*, 787 A.2d 1007, 1013 (Pa. Super. 2001). Although the statute focuses on an analysis of the six months immediately preceding the filing of the petition, "the court must consider the whole history of a given case and not mechanically apply the six-month statutory provision." *In re K.Z.S.*, 946 A.2d 753, 758 (Pa. Super. 2008) (citation omitted). Rather, "[t]he court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination." *Id.* (citations omitted). "However, with respect to any petition filed pursuant to subsection (a)(1), . . . the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of petition." *In re Adoption of A.C.*, 162 A.3d at 1129 (citing 23 Pa.C.S. § 2511(b)).

This Court has repeatedly defined "parental duties" in general as the affirmative obligation to provide consistently for the physical and emotional needs of a child:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance. This affirmative duty . . . requires continuing interest in the child and a genuine effort to maintain communication and association with the child. Because a child needs more than

> a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (citations and internal paragraph breaks omitted).

Moreover, "[p]arental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." *Id.* (citation omitted). "A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship." *Id.* (citation omitted). And most importantly, "[p]arental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs." *Id.* (citation omitted). Simply put, "adequate parenting requires **action** as well as **intent**." *In re J.W.*, 578 A.2d 952, 959 (Pa. Super. 1990) (emphasis in original).

Instantly, the trial court found that Father failed to perform parental duties for Child for twenty months while Child was in placement. Trial Ct. Op. at 13. The trial court opined:

> Both [parents] were deceptive with [the Agency] and exhibited immature, lackadaisical attitudes toward their role as the parents of [] Child. Neither are anywhere near completion of their goals. They were unable to provide necessary items for [] Child's care for even the brief periods of visitation, and it is unlikely that they

- 9 -

would be able to do so if they were responsible for [] Child's care on a regular basis.

*Id.* The trial court emphasized that Father did not make any effort towards achieving most of his goals and assuming his parental duties until after the Agency filed the TPR Petition: "[u]p to that time, their conduct indicated either that they did not take [the Agency] involvement seriously or that they were simply disinterested in performing their parental duties and maintaining a relationship with their Child." *Id.* The trial court made findings that Father had ample time to complete his goals and "build a lifestyle suitable for the safe return and care of [] Child" but "failed to take advantage of the many services and opportunities for help offered by [the Agency], all to the detriment of [Child]." *Id.*

Our review of the record reveals that the trial court's findings are supported in the record, and that the Agency met its burden under Section 2511(a)(1). Father failed to act affirmatively and utilize all available resources to reunify with Child and preserve the parental relationship. Father argues that because Maternal Grandparents owned the home where he lived, he was powerless to improve the home conditions or allow the Agency access to the home. However, Father failed to exercise reasonable firmness to overcome the obstacles that he faced, including maintaining employment so that he could obtain alternative housing. Moreover, this Court cannot preserve Father's parental rights because he admits to having an "immature, lackadaisical attitude" and an "emotional inability to complete the tasks." On

- 10 -

the contrary, as stated above, "[p]arental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs." **In re B., N.M.**, 856 A.2d at 855 (citation omitted).

Our review of the record supports the trial court's findings. We decline to reweigh the evidence or usurp the lower court's credibility determinations. Accordingly, we find no abuse of discretion. Moreover, because we agree that the Agency met its burden to terminate Father's parental rights pursuant to subsection (1) of Section 2511(a), we decline to address additional subsections.

**Termination Pursuant to 23 Pa.C.S. § 2511(b)**

Father also contends that the trial court abused its discretion in terminating his parental rights pursuant to 23 Pa.C.S. § 2511(b). Father's Br. at 14. In his three-sentence argument, Father makes a bald averment that severing his parental bond with Child would have a detrimental effect on her. *Id.* Father's argument fails.

With respect to Section 2511(b), our analysis focuses on the effect that terminating the parental bond will have on the child. In particular, we review whether "termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." **In re Adoption of J.M.**, 991 A.2d 321, 324 (Pa. Super. 2010). It is well settled that "[i]ntangibles such as love, comfort, security, and stability are involved in the

inquiry into needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted).

One major aspect of the "needs and welfare" analysis concerns the nature and status of the emotional bond that the child has with the parent, "with close attention paid to the effect on the child of permanently severing any such bond." *In re Adoption of N.N.H.*, 197 A.3d 777, 783 (Pa Super. 2018) (citation omitted). The fact that a child has a bond with a parent does not preclude the termination of parental rights. *In re A.D.*, 93 A.3d 888, 897 (Pa. Super. 2014). Rather, the trial court must examine the depth of the bond to determine whether the bond is so meaningful to the child that its termination would destroy an existing, necessary, and beneficial relationship. *Id.* at 898. Moreover, the trial court may consider intangibles, such as the love, comfort, security, and stability the child might have with the adoptive resource. *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011). Ultimately, the concern is the needs and welfare of the child. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010).

The record belies Father's claims that severing his parental bond would be detrimental to Child. The trial court heard **uncontradicted** testimony from Ms. Belsak that Father and Child shared a bond, but that severing their bond would **not** have a detrimental impact on Child and that terminating parental rights would be in Child's best interest. N.T. TPR Hearing at 77, 79. The trial court made findings that: "Child is thriving in her current placement and has

bonded with her foster family. The daughter and son-in-law of [] Child's foster parents will be seeking to adopt her and she will thus be able to maintain these relationships and they will provide her with the stable home life and environment she deserves." Trial Ct. Op. at 14. The trial court concluded that terminating Father's parental rights would be in Child's best interest. *Id.* The record supports the trial court's findings, and we find no abuse of discretion.

## CONCLUSION

In conclusion, the trial court did not abuse its discretion when it found that the Agency presented clear and convincing evidence to terminate Father's parental rights to Child, and that termination of Father's parental rights would be in Child's best interest.

Decree affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 06/14/2021