J-S07031-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: P.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: P.M., MOTHER | : | No. 3095 EDA 2022 |

Appeal from the Order Entered November 9, 2022
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s):  CP-51-DP-0000509-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: P.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: P.M., MOTHER | : | No. 3096 EDA 2022 |

Appeal from the Decree Entered November 9, 2022
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s):  CP-51-AP-0000509-2022

| | | |
|---|---|---|
| IN THE INTEREST OF: A.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: P.M., MOTHER | : | No. 3097 EDA 2022 |

Appeal from the Order Entered November 9, 2022
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s):  CP-51-DP-0000510-2020

| IN THE INTEREST OF: A.M.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: P.M., MOTHER | : | No. 3098 EDA 2022 |

Appeal from the Decree Entered November 9, 2022
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-AP-0000506-2022

BEFORE: DUBOW, J., KUNSELMAN, J., and KING, J.

MEMORANDUM BY KING, J.: **FILED APRIL 21, 2023**

Appellant, P.M. ("Mother"), appeals from the decrees and orders entered in the Philadelphia County Court of Common Pleas, granting the petition of Appellee, Philadelphia County Department of Human Services ("DHS"), for involuntary termination of Mother's parental rights to her minor children, P.L.M. and A.M.M. ("Children"), and changing the placement goal to adoption. We affirm.

The relevant facts and procedural history of this appeal are as follows. P.L.M. was born in May 2008. A.M.M. was born in January 2010. DHS first became aware of the family in May 2020, when it received a General Protective Services report regarding Mother's struggles with bipolar disorder, incidents of domestic violence, and sporadic periods of homelessness. (*See* Petition for Goal Change for P.L.M., filed 8/24/22, at Exhibit A, ¶b). Specifically, Mother and Children were homeless in May 2020. Mother and Children went to New

Jersey to stay with Mother's parents for a short time. Mother and Children left the home after Mother "had been aggressive with the children's maternal grandmother … resulting in [Mother] being charged with assault." (***Id.***) Ultimately, Mother and Children returned to Philadelphia to reside with A.C. ("Father").[1] Father later informed DHS that Mother "was very unstable," and Father "had never seen her exhibit such concerning behavior." (***Id.***)

On May 5, 2020, DHS employees went to the family home for further investigation. Upon arrival, DHS employees observed Mother speaking with police officers outside the residence. The police officers informed DHS that Mother had called for assistance alleging that Father was abusive. The DHS employees questioned Children about the incident separately. Children stated that their parents argued frequently, and Father would "beat the demons" out of Mother. (***Id.*** at ¶d). Children also confirmed that during their most recent stay in the family home, Father "pinned [Mother] to the floor" during an argument. (***Id.***)

On May 14, 2020, DHS filed separate dependency petitions for P.L.M. and A.M.M. The court adjudicated Children dependent on June 26, 2020. In conjunction with the dependency petitions, the court granted legal custody of Children to DHS. In turn, DHS placed Children into kinship care with their maternal uncle and aunt. Children have remained with their maternal uncle

_____

[1] Father voluntarily relinquished his parental rights on November 9, 2022, and he is not a party to the current appeals.

- 3 -

and aunt ever since. (**See** N.T. Termination Hearing, 11/9/22, at 14, 55-57).

Mother received single case plan objectives, including referrals to the Achieving Reunification Center ("ARC") for parenting classes, an evaluation from Behavioral Health Services ("BHS"), domestic violence and healthy relationship classes, and obtaining employment. (**Id.** at 16). Initially, Mother was slow to comply with her objectives. Nevertheless, Mother's "compliance level went upward [in] May of 2022." (**Id.** at 21).

On August 23, 2022, DHS filed a petition for the involuntary termination of Mother's parental rights to A.M.M. On August 24, 2022, DHS filed a petition for the involuntary termination of Mother's parental rights to P.L.M. DHS also filed corresponding petitions seeking to change Children's goals to adoption. The court conducted a termination hearing on November 9, 2022. At the hearing, the court received testimony from Mother and the Community Umbrella Agency ("CUA") case manager. Following the hearing, the court entered decrees terminating Mother's parental rights to Children. The court entered separate orders noting the change of Children's goal to adoption. On December 6, 2022, Mother timely filed separate notices of appeal and concise statements of errors. This Court consolidated the matters *sua sponte* on December 29, 2022.

Mother now raises four issues for this Court's review:

> Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother … pursuant to 23 Pa.C.S.A. Section 2511(a)(1) without clear and convincing

evidence that Mother failed to perform her parental duties.

Whether the trial court erred and/or abused its discretion by terminating the rights of Mother … pursuant to 23 Pa C.S.A. Section 2511(a)(2) without clear and convincing evidence of Mother's present incapacity to perform her parental duties.

Whether the trial court erred and/or abused its discretion by terminating the rights of Mother … pursuant to 23 Pa.C.S.A. Sections 2511(a)(5) and 2511(a)(8) without clear and convincing evidence that the conditions that led to placement continue to exist when Mother presented evidence of compliance with the goals and objectives of her single case plan.

Whether the trial court erred and/or abused its discretion by terminating the rights of Mother … pursuant to 23 Pa.C.S.A. Section 2511(b) without clear and convincing evidence that there is no parental bond between Mother and children and that termination would serve the best interest of the children.

(Mother's Brief at 7).

Appellate review in termination of parental rights cases implicates the following principles:

A parent's right to make decisions concerning the care, custody, and control of his or her children is among the oldest of fundamental rights. The time-tested law of the Commonwealth requires that we balance this intrinsic parental interest within the context of a child's essential needs for a parent's care, protection, and support. We readily comprehend the significant gravity of a termination of parental rights, which has far-reaching and intentionally irreversible consequences for the parents and the child. For these reasons, the burden of proof is upon the party seeking termination to establish by clear and convincing evidence the existence of the statutory grounds for doing so. [C]lear and convincing evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of

the truth of the precise facts in issue. Because of this serious impact attending the termination of parental rights, it is important that a judicial decree extinguishing such rights be based solely on competent evidence.

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. This standard of review corresponds to the standard employed in dependency cases, and requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but it does not require the appellate court to accept the [trial] court's inferences or conclusions of law. That is, if the factual findings are supported, we must determine whether the trial court made an error of law or abused its discretion. An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion; we reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will. Thus, absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. However, [w]e must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re Adoption of C.M.*, ___ Pa. ___, ___, 255 A.3d 343, 358-59 (2021) (internal citations and quotation marks omitted).

DHS filed a petition for the involuntary termination of Mother's parental rights on the following grounds:

### § 2511. Grounds for involuntary termination

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

- 6 -

> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

> \* \* \*

> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b). "Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions." *In re Z.P.*, 994 A.2d 1108, 1117 (Pa.Super. 2010).[2]

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

---

[2] DHS also sought the involuntary termination of Mother's parental rights under Section 2511(a)(2), (5) and (8), but we need only analyze Section 2511(a)(1) for purposes of this appeal.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (internal citations omitted).

Mother's issues are related, and we address them together. Mother contends that she successfully completed her case plan objectives by the time of the termination hearing. Mother emphasizes that she completed her referrals to ARC, obtained a BHS evaluation, and finished programs on domestic violence and healthy relationships. Although Mother had yet to obtain suitable housing, Mother maintains that a court cannot terminate parental rights based solely on an environment factor such as housing.

Mother acknowledges that her visits with Children were virtual. Mother insists, however, that Children "came into care during the worst time of the COVID pandemic," and she "always asked about the children" whenever she contacted the CUA case manager. (Mother's Brief at 21). Mother also acknowledges that visitation is at Children's discretion. To the extent that Children might have been reluctant to engage in visitation due to the family's history with domestic violence, Mother notes that Father left the family residence in January 2022. Mother complains that the CUA case manager failed to inform Children about Father's departure, and Children might have desired more visitation if they had known that Father was no longer in the home. Under these circumstances, Mother asserts that she "never evidenced a settled purpose of relinquishing her parental rights nor has she refused to perform her parental duties." (Mother's Brief at 23). Thus, Mother insists that DHS failed to present clear and convincing evidence warranting termination

under Section 2511(a)(1).

Regarding Section 2511(b), Mother argues that the CUA case manager did not testify about the existence of a bond between Mother and Children. Mother posits:

> It is impossible to assess the bond between Mother and … Children and whether termination of Mother's parental rights would have a detrimental effect on … Children based on the fact that she [did not] have the opportunity to visit with … Children for some time prior to the termination of parental rights hearing.  Mother's ability to deepen and strengthen the bond between her and her children was limited by the actions of [DHS] and [its] agents.

(*Id.* at 31-32).  Mother also insists that the CUA case manager's testimony and the comments from Children's legal counsel established that Children and Mother love each other.  Based upon the foregoing, Mother concludes the court erred and abused its discretion by terminating her parental rights.  We disagree.

"A court may terminate parental rights under subsection 2511(a)(1) when the parent demonstrates a settled purpose to relinquish parental claim to a child or fails to perform parental duties for at least six months prior to the filing of the termination petition."  *In re I.J.*, 972 A.2d 5, 10 (Pa.Super. 2009).

> Though we do not adhere to any strict definition of parental duty, a child has a right to essential parental care, and our jurisprudence reveals certain irreducible qualities of a parent's attendant obligation.  Foremost, it is a positive duty requiring affirmative performance.  [C]ommunication and association are essential to the performance of parental duty[.]  [P]arental duty requires that a parent exert himself

to take and maintain a place of importance in the child's life. A parent must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship, or his rights may be forfeited. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*Adoption of C.M., supra* at \_\_\_, 255 A.3d at 364 (internal citations and quotation marks omitted).

Regarding the six-month period prior to filing the termination petition:

[T]he trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004), *appeal denied*, 582 Pa. 718, 872 A.2d 1200 (2005) (internal citations omitted).

Under Section 2511(b), the court must consider whether termination will meet the child's needs and welfare. *In re C.P.*, 901 A.2d 516, 520 (Pa.Super. 2006). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." *Id.* (internal citations omitted). "In this context, the court must take into account whether a bond exists between child and parent, and whether

- 10 -

termination would destroy an existing, necessary and beneficial relationship."
*In re Z.P., supra* at 1121.

Instantly, the court received testimony from Kim Augustus, the CUA case manager. Ms. Augustus was assigned to this case in September 2021. (*See* N.T. Termination Hearing at 10). Nevertheless, she was familiar with the entire case file, which she was responsible for maintaining. (*Id.* at 11). Ms. Augustus identified Mother's single case plan objectives, and she indicated that Mother had achieved substantial compliance with her objectives by the time of the hearing. (*Id.* at 16, 21). However, Mother's compliance level was "minimal" when Ms. Augustus first inherited the case, and Mother compliance level began to "shift upward" as recently as May 2022. (*Id.* at 21).

Ms. Augustus confirmed that visits occur at Children's discretion. (*Id.* at 22). P.L.M. no longer wished to visit with Mother at the time of the hearing, and her last visit occurred in November 2021. (*Id.*) Likewise, A.M.M. no longer wished to visit with Mother. (*Id.* at 56). Ms. Augustus could not provide the date of Mother's last visit with A.M.M.[3] Nevertheless, Ms. Augustus explained that A.M.M. did not want to continue visitation because "she does not like how she feels after visiting with her mother." (*Id.*)

Regarding a parent/child bond, Ms. Augustus could not state whether it exists. (*Id.* at 24, 57). Children, however, do not look to Mother for care,

---

[3] Later in the hearing, the child advocate stated that A.M.M.'s last visit with Mother occurred during "holiday time last year." (*Id*. at 71).

comfort, or support. (*Id.* at 24, 58). Rather, Children have developed a close relationship with their maternal uncle and aunt, on whom they rely for stability. (*Id.* at 25, 58). Consequently, Ms. Augustus opined that Children would not suffer irreparable harm if the court terminated Mother's parental rights. (*Id.* at 58). Further, Ms. Augustus testified that a goal change to adoption was in Children's best interests. (*Id.* at 27, 58).

Following the testimony from Ms. Augustus, the court received argument from the guardian *ad litem* and the child advocate. The guardian *ad litem* agreed that termination was warranted. While the guardian *ad litem* commended Mother for her efforts at compliance with the case plan objectives, he argued that Mother had done "[t]oo little, too late." (*Id.* at 46). The child advocate agreed that termination was in Children's best interests. (*Id.* at 49). The child advocate also provided insight into Children's relationship with Mother and their desire to be adopted. The child advocate discussed P.L.M. as follows:

> She wasn't angry. She wasn't resentful. She just believed that Mother had issues. But she said she believes that her mother loves her. And she still doesn't want any contact with her. Her concerns were Mother's mental health.
>
> And she felt like Mother needed to prove to them, or to her … that she was in touch with her emotional and psychological needs before she would be able to care for [P.L.M.], which I thought was very mature. She also indicated that the home in which they lived, and she believes her mother still lives, was deplorable. And that even if her mother moved, she doesn't want to go there.
>
> She stated that in her resource home she has a space. She

has her own room. She has a family that spends time with her, engaged in activities with her, is supportive of her. She also, which was striking to me, indicated that the resource parents have a good relationship. And that was very important to her.

(*Id.* at 47).

The child advocate expressed similar sentiments from A.M.M.:

And it's interesting that she still does not want to see Mother based on the same fears, concerns about Mother's mental stability. Although she did not indicate that she had as much compassion for Mother. She wasn't angry. But she just didn't find that Mother's issues were her concern. And she—as I said, she still does not want to see her.

\* \* \*

[A.M.M.'s] not an old soul, but she's mature. And it's apparent that whatever the parents were going through when she was living with them [has] left a scar on her as well. And so she said that she wants to have the resource parents as parents.

She doesn't want to have to go through … what she went through with her mother and father. And that she wants to have her cousins as siblings. She too indicated she does not want to live in a place without her sister. And that she has found a place where she says she's the most important person there.

(*Id.* at 71-73).

The court considered the testimony and determined that DHS had provided clear and convincing evidence in support of termination. When explaining its decision, the court stated:

And while [Mother] may be substantially compliant at this time, her progress has been recent. And at this time she does not have appropriate housing for reunification to take place…. The testimony reflects that [Children] would not

- 13 -

suffer irreparable harm if [Mother's] rights are terminated.

Notwithstanding again [Mother's] recent completion of some of the single case plan objectives, the children deserve permanency. They both want to be adopted.

\* \* \*

The developmental, physical, emotional needs and welfare of the children are being met by their foster parents. The inference would be that there is a bond with them. And they are in the home where they are well cared for and where they are currently thriving.

(*Id.* at 75-76). We accept the court's analysis, which is supported by the record.

While Mother argues that she did not demonstrate a settled purpose of relinquishing her parental claim to Children, the record reveals a failure to perform any parental duties since Children's initial placement in June 2020. *See Adoption of C.M., supra*; *In re I.J., supra*. Additionally, regardless of whether a bond exists between Mother and Children, terminating Mother's parental rights would not destroy existing, necessary, and beneficial relationships for Children. *See In re Z.P., supra*. Based upon the foregoing, our review of the record confirms that clear and convincing evidence supported termination of Mother's parental rights under Sections 2511(a)(1) and (b). *Id.* Consequently, we affirm the decrees terminating Mother's parental rights and the orders changing the placement goals to adoption.

Decrees and orders affirmed.

Judge Kunselman joins this memorandum.

Judge Dubow did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/21/2023