J-S36003-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.V., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.V., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1201 EDA 2021 |

Appeal from the Order Entered June 7, 2021
In the Court of Common Pleas of Wayne County Civil Division at No(s):
CP-64-DP-0000008-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: K.V., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.V., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1202 EDA 2021 |

Appeal from the Order Entered May 7, 2021
In the Court of Common Pleas of Wayne County Civil Division at No(s):
CP-64-DP-0000009-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: K.V., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.V., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1371 EDA 2021 |

Appeal from the Order Entered June 9, 2021
In the Court of Common Pleas of Wayne County Civil Division at No(s):
CP-64-DP-0000009-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: K.V., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |

J-S36003-21

|  | : |  |
| --- | --- | --- |
| APPEAL OF: C.V., FATHER | : | |
|  | : | |
|  | : | |
|  | : | |
|  | : | |
|  | : | No. 1372 EDA 2021 |

Appeal from the Order Entered June 7, 2021
In the Court of Common Pleas of Wayne County Civil Division at No(s):
7-AD-2021

| IN THE INTEREST OF: K.V., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| --- | --- | --- |
|  | : | |
|  | : | |
|  | : | |
| APPEAL OF: C.V., FATHER | : | |
|  | : | |
|  | : | |
|  | : | |
|  | : | |
|  | : | No. 1373 EDA 2021 |

Appeal from the Order Entered June 9, 2021
In the Court of Common Pleas of Wayne County Civil Division at No(s):
CP-64-DP-0000008-2020

| IN THE INTEREST OF: K.V., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| --- | --- | --- |
|  | : | |
|  | : | |
|  | : | |
| APPEAL OF: C.V., FATHER | : | |
|  | : | |
|  | : | |
|  | : | |
|  | : | No. 1374 EDA 2021 |

Appeal from the Order Entered June 7, 2021
In the Court of Common Pleas of Wayne County Civil Division at No(s):
8-AD-2021

BEFORE:   LAZARUS, J., KING, J., and COLINS, J.[*]

---

[*] Retired Senior Judge assigned to the Superior Court.

- 2 -

J-S36003-21

MEMORANDUM BY LAZARUS, J.:                **FILED JANUARY 25, 2022**

C.V. (Father) appeals[1] from the orders,[2] entered in the Court of Common Pleas of Wayne County, finding aggravated circumstances, changing the permanency goal to adoption, and involuntarily terminating his parental rights to his twin children, K.V. and K.V. (born August 2014) (collectively, Children). After careful review, we affirm.

On February 2, 2021, officers stopped a vehicle Mother[3] was driving and in which Father and Children were passengers. At the time of the stop, Father was under the influence. Both Mother and Father admitted that they were habitual drug users addicted to methamphetamine and cocaine. Children were not wearing seatbelts. Following a search of the vehicle, law enforcement found Father in possession of marijuana and a crack pipe. On February 4, 2020, the police observed more drug paraphernalia during a search of Father's

---

[1] On September 7, 2021, our Court *sua sponte* consolidated Father's appeals at Nos. 1201-1202 EDA 2021 and Nos. 1372-1373 EDA 2021. **See** Pa.R.A.P. 513.

[2] Father filed separate notices of appeal from each order in each docketed case. Thus, the concerns raised in **Commonwealth v. Walker**, 185 A.3d 960, 976 (Pa. 2018), are not implicated in this appeal. **See id**. at 976-77 (establishing "bright-line mandatory instruction to practitioners to file separate notices of appeal").

[3] Children's Mother's parental rights were also involuntarily terminated. She has filed a separate appeal to this Court at Nos. 1369 EDA 2021 and 1370 EDA 2021.

- 3 -

home.[4]   At that time, Children had missed approximately 20 days of school and, ultimately, had to repeat kindergarten.

On February 4, 2020, the court held a shelter care hearing and entered an emergency protective order temporarily transferring custody of Children to Wayne County Children and Youth Services (CYS).  Father was represented at the shelter care hearing by appointed counsel.  The court ordered supervised visitation between Father and Children no less than twice per month[5] and established the following permanency plan and objectives for Father:  receive parenting education classes; obtain drug and alcohol evaluations; and "follow any and all recommendations, [including] sign[ing] releases for [CYS]." Permanency Plan Order, 2/11/20; *Id.* at 2/19/20.   Concurrent goals of reunification and adoption were established.

On February 7, 2020, Father tested positive for methamphetamine, amphetamine, cocaine, and marijuana.   Father also tested positive for methamphetamine, amphetamine, and marijuana on February 11, 2020.

Children were adjudicated dependent on  February 20, 2020, and placed into a "resource home" in Honesdale, Pennsylvania.   During Children's placement, Father completed inpatient treatment, but did not follow up with

_____

[4] During their initial search of Parents' residence, police suspected a potential methamphetamine lab had been erected and was operational within the home. However, upon further investigation, it was determined not to be one.

[5] The visitation plan specifically stated that "Parents are responsible for their own transportation" to and from visits.  Visitation Plan, 2/19/20, at 12.

any recommendations. Father admitted to relapsing and using drugs again, struggling with mental health issues, including diagnoses of depression and anxiety. Father attended between 14%-18%[6] of his scheduled visits with Children; the visits were held in-person, virtually, and over the phone.

With regard to his progress and compliance with service plan objectives, CYS deemed Father to have "minimally" complied/progressed at the June 2020 and June 2021 hearings, and "no[t to have]" complied at the September 2020, December 2020, and March 2021 permanency hearings. N.T. Goal Change/Termination Hearing, 6/7/21, at 16-17. CYS caseworker Sarah Hoger testified that she or another caseworker would tell Parents what the concurrent goal was throughout the process, what the expectations were for each Parent with regard to their individual service plans, and would also leave voicemails and send emails to Father telling him to call CYS to set up visits. *Id.* at 39.

Father was incarcerated from April 5, 2021; he was still incarcerated at the time of the parties' goal change/termination hearing on June 7, 2021. While in jail, Father completed a childcare program and attended all of his PA Treatment and Healing (PATH) appointments. *Id.* at 32. Father wrote letters to Children while incarcerated and also saw a prison psychiatrist who stabilized

---

[6] At the aggravated circumstances hearing, CYS caseworker Hoger testified that Father attended 16 out of 112 scheduled visits. N.T. Aggravated Circumstances Hearing, 5/6/21, at 5. However, at the goal change/termination hearing, Hoger testified that Father attended 18 out of 98 visits. N.T. Goal Change/Termination Hearing, 6/7/21, at 13.

his medications to treat his depression and anxiety. *Id.* Moreover, a CYS caseworker went to the prison directly to see Father to set up visits with Children. N.T. Aggravated Circumstances Hearing, 5/6/21, at 14-15, 18.

A CYS caseworker testified that Father had trouble attending in-person visits due to lack of transportation so the agency made accommodations by providing him transportation to visits and also offering him telephonic and virtual visits. *Id.* at 39-40. That same caseworker testified that, since his incarceration, Father set up visits with Children, and during those visits Children seem "happy to see their father." *Id.* at 33. However, the caseworker acknowledged that the agency had trouble reaching Father from May through July 2020 and then again from August 2020 through March 2021 after his phone was disconnected. *Id.* at 35; *see* N.T. Aggravated Circumstances Hearing, 5/6/21, at 27 (social worker in charge of arranging visitation for Father testified she reached out to Father via email and telephone "an average of five times a week, sometimes several times in a day . . . [over] the last six months" prior to aggravated circumstances hearing; Father only answered phone one time and hung up on social worker). Father's service plan required him "to provide the agency with any changes in the family's address, children's address, or family circumstances within 24 hours." Service Plan, 2/19/20, at 14. *See* N.T. Aggravated Circumstances Hearing, 5/6/21, at 12-13 (caseworker testifying Father never updated his phone number after phone number on file disconnected and did not respond to CYS emails); *see also id.* at 28 (social worker testifying that email she used to contact Father

over six-month period "works" because paternal grandmother used same email to arrange virtual visits with Children).

Father testified that he could not accomplish his service plan goals in the 15-month period that Children have been in placement. *Id.* at 73. While Father testified that he is now in a much better place emotionally and mentally than he was when Children were first put into placement, he also stated that it would take him "three months or so" after his release from jail to "have everything on track" and achieve his service objectives. *Id.*

On April 19, 2021, CYS filed a motion for aggravated circumstances with regard to Father. *See generally* 42 Pa.C.S. § 6302 (disposition best suited to protection and physical, mental, and moral welfare of Children). Counsel was appointed to represent Father in May 2021, prior to the aggravated circumstances hearing.[7] On May 7, 2021, the trial court held a hearing and concluded that clear and convincing evidence established that aggravated circumstances exist as to Father where he "failed to maintain substantial and continuing contact with [Children] for a period of six months." *Id.* at § 6302(1)(ii) (defining "Aggravated circumstances"). The trial court also determined that CYS no longer needed to make reasonable efforts to reunify Child with Father. *Id.* The court gave the following oral ruling:

_____

[7] However, a caseworker testified that, as per routine procedure, during each court hearing (beginning with the date of placement) CYS would give Father paperwork to fill out to have the court appoint an attorney for him. *Id.* at 36.

C[YS] today provided information and testimony in regards to helping [Father] with drug and alcohol addiction issues[,] as well as mental health services for [F]ather, and the same is evidenced. If you just go back through the findings of this [c]ourt and the permanency plan sheets, it's all written down in there, there's clearly a failure on behalf of [F]ather to make an effort to visit with [C]hildren over the past six months. Testimony from [CYS] is clear they attempted to do so on multiple occasions. There's also evidence that [F]ather has failed to update [CYS] on a phone number or provide information on how to best reach him. Testimony has shown that he has failed to respond to numerous phone calls and emails by the agency to initial contact with these minor children over the period of time of the last six months, and, thus[,] aggravate[ed] circumstances do exist.

N.T. Aggravated Circumstances Hearing, 5/6/21, at 29.

On May 12, 2021, CYS filed petitions seeking to involuntarily terminate Mother's parental rights based on 23 Pa.C.S. §§ 2511(a)(1), (2), (5), (8), and (b). On June 7, 2021, the trial court held a goal change/termination hearing[8] at which Mother, Father, and CYS caseworker Hoger testified. Following the hearing, the court granted CYS' petitions and terminated Mother's and Father's

_____

[8] Guardian *ad litem*, John Martin, II, Esquire, was appointed on February 5, 2020, and represented Children at the termination hearing.

parental rights pursuant to sections 2511(a)(2) and (b)[9] of the Adoption Act.[10]

Father filed, contemporaneously, a timely notice of appeal and Pa.R.A.P. 1925(a)(2) concise statement of errors complained of on appeal. Father presents the following issues for our consideration:

(1) Whether the trial court erred as a matter of law and abused its discretion in finding aggravating circumstances exist as to Father and no efforts are to be made to preserve the family and reunify [Children] with Father and changed the goal to adoption[.]

(2) Whether the trial court erred as a matter of law and abused its discretion in finding that Father failed to maintain substantial and continuing contact with [Children] for a period of six months, when the six months had not expired and when the evidence presented at trial supported a finding that Father was denied contact with [Children] due to the COVID-19 pandemic[.]

(3) Whether the trial court erred as a matter of law and abused its discretion in failing to appoint counsel for Father prior to [CYS]'s filing of the [m]otion of [f]inding of [a]ggravated [c]ircumstances[.]

(4) Whether the trial court erred as a matter of law and abused its discretion in failing to find that [CYS] did not timely

_____

[9] *See* 23 Pa.C.S. § 2511(b) ("Other considerations.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.").

[10] 23 Pa.C.S. §§ 2101-2938.

> contact and accommodate Father with visitation and communication with [Children.]
>
> (5) Whether the trial court erred as a matter of law and abused its discretion in terminating Father's parental rights[.]

Father's Brief, at 9-10.

Father first challenges the trial court's finding that aggravated circumstances existed under the Juvenile Act and that "[n]o efforts [were] to be made to preserve the family and reunify [Children] with Father." Aggravated Circumstances Order, 5/7/21.

In an appeal from an order finding aggravated circumstances, we review for an abuse of discretion. *In the Interest of L.Z.*, 111 A.3d 1164, 1174 (Pa. 2015). In dependency cases, "an appellate court [] accept[s] the findings of fact and credibility determinations of the trial court if they are supported by the record, but [we] do[] not [have] to accept the [trial] court's inferences or conclusions of law." *Id.* (citation omitted).

The Juvenile Act provides that a child may be adjudicated dependent if the child meets the requirements of one of ten definitions listed in 42 Pa.C.S. § 6302. If a juvenile court determines that a child is dependent, and aggravated circumstances have been alleged by either the county agency or by the child's attorney, the court must also determine if aggravated circumstances exist. 42 Pa.C.S. § 6341(c.1). If the court determines that aggravated circumstances do exist, the court must then consider whether reasonable efforts should be made to reunify the child with his or her parent. *Id.* Following a finding of aggravated circumstances, a court may end

reasonable efforts at its discretion. *In re L.V.*, 127 A.3d 831, 839 (Pa. Super. 2015) (citation omitted).

Instantly, the trial court found aggravated circumstances with regard to Father under the following Juvenile Act provision:

(1) The child is in the custody of a county agency and[]:

\* \* \*

(ii) the identity or whereabouts of the parents is known and the parents have **failed to maintain substantial and continuing contact** with the child for a period of six months.

42 Pa.C.S. § 6302(1)(ii) (emphasis added).

Here, Children were removed from Father on February 4, 2020, and declared dependent on February 20, 2020. Father was incarcerated on April 5, 2021, and aggravated circumstances were found to exist on May 7, 2021. Therefore, for more than one year Father either completely failed to or minimally progressed or complied with his plan goals. Father admittedly continued to sink deeper and deeper into his drug addiction and also refused to treat his significant mental health issues when given the opportunity to do so by CYS. While the pandemic certainly made in-person treatment difficult, if not impossible, Father could have exercised the option of virtual telehealth appointments. Instead, Father chose to walk out during intake for one of his services and also to refuse treatment altogether.

Father was also offered 112 visits; he attended 16 of those visits. *See supra* at n.5. Eight of the visits were in-person, six were virtual and two were

- 11 -

held over the phone while he was in rehabilitation. N.T. Aggravated Circumstances Hearing, 5/6/21, at 6. The last time Father saw Children was October 2020. *Id.*

Prior to his incarceration, Father had attended three inpatient/outpatient services, *id.* at 44, only one of which led to a successful discharge. *Id.* at 45. Father was "encouraged" by CYS to participate in drug and alcohol services to treat his addiction issues. A CYS caseworker testified that CYS set up drug and alcohol services for Father in September 2020,[11] but Father walked out during the intake process "stating that he didn't want to attend in[]patient services." *Id. See id.* at 9 (caseworker testifying Father "stated that he did not need rehab[ilitation] or drug and alcohol services"). Father also failed to treat his mental health issues before his incarceration despite CYS urging him to set up mental health services to address his depression and anxiety issues, *id.* at 10, and providing him with a list of behavioral health centers to address those concerns. *Id.* at 11.

CYS caseworker Hoger testified that, assuming Father completed all of his plan goals (obtain housing and employment and treat his mental health, drug, and alcohol problems), the earliest Children could be returned to him would be one year after his release from prison. *Id.* Caseworker Hoger also testified that CYS no longer believed that reunification was an appropriate

---

[11] The record incorrectly states September 202**1**. *See id.*

goal, asked that the goal to be changed to adoption, and stated that Children could likely be adopted within three months. *Id.* at 18.

It is well-established that parents have an affirmative duty to maintain a place of importance in their children's lives:

> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (citations omitted). "This affirmative duty . . . requires continuing interest in the child and a genuine effort to maintain communication and association with the child." *Id.* (quoting *In re C.M.S.*, 832 A.2d 457, 462 (Pa. Super. 2003)). Finally, "parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with [the child's] physical and emotional needs." *In re B., N.M.*, *supra* at 855.

Due to prison policy during the COVID-19 pandemic, Father claims he was not permitted to have in-person visits in January 2021 until the aggravated circumstances hearing in May 2021. Father's Brief, at 14. Father contends that during this time period, CYS did not arrange for video or phone visitation, despite his requests for same. *Id.* Counsel for Father argues that "[i]n light of the world-wide pandemic, more time should have been given to Father, given his mental and substance abuse illnesses that were not properly

addressed until he was incarcerated." *Id.* at 17. Finally, Father alleges that he was not appointed counsel until two weeks after CYS' aggravated circumstances motion was filed. *Id.*

At the aggravated circumstances hearing, CYS caseworker Hoger testified that while there was a ten-day quarantine period for Father when he was first incarcerated in April 2021, the pandemic did not "affect[ Father's] ability to see [Children] in any way over the last six months." N.T. Aggravated Circumstances Hearing, 5/7/21, at 12, 18. Visits were held virtually until March 2, 2021, returned to in-person briefly, and then held virtually again. *Id.* at 12. However, during the in-person period, CYS offered virtual visitation as an option to Father. *Id.* Caseworker Hoger testified that during those months, CYS tried to contact Father to set up visits, "but he did not attend any of them." *Id.*

In its Rule 1925(a) opinion, the trial court found that although CYS "encouraged and advocated for Father to receive drug and alcohol rehabilitative services [and] mental health treatment[,] . . . Father . . . did not cooperate with [CYS] to obtain rehabilitative services necessary in order to [fulfill] parental duties." Trial Court Opinion, 7/8/21, at 2-3. The court also noted:

> CYS presented Father with multiple opportunities to maintain substantial and continuing contacts with the minor children, and he failed to take advantage of those opportunities. Because Father only attended 16 out of the possible 112 visits,[12] and he

---

[12] *See supra* at n.4.

failed to take advantage of the 96 other opportunities to spend time with the minor children, this [c]ourt found that Father did not meet his parental duty.

*Id.* at 4.

After an exhaustive review of the record, including the notes of testimony from the aggravated circumstances hearing, we conclude that the trial court correctly found that aggravated circumstances existed with regard to Father. The court deemed credible CYS' evidence that Father had not taken advantage of services offered for him to accomplish his service plan objectives. Moreover, Father's contention that because of the pandemic he did not have access to the necessary services and that CYS placed unrealistic expectations on him to succeed in his goals is simply disingenuous. He was given over a year to comply and progress and never exceeded "minimal" compliance over that time period. Further, many of Father services and visits were offered as virtual options to accommodate COVID-19 protocols. Accordingly, we conclude that the court properly determined that Father failed to maintain substantial and continuing contact with Children for a period of six months, 42 Pa.C.S. § 6302(1)(ii), and, thus, aggravated circumstances existed and the court did not abuse its discretion in concluding that CYS no longer had to make reasonable efforts to reunify Children with Father. *In re L.V.*, *supra*.

With regard to Father's claim that he was unrepresented at the time CYS filed the motion for aggravated circumstances, the court noted that "[i]t is this [c]ourt's standard practice to ask if Father wants an attorney, and the court

made every effort and asked Father whether he wanted to obtain legal representation." Trial Court Opinion, 7/8/21, at 4. The court then stated that Father either failed to appear for the hearing, rejected the offer for court-appointed counsel "at other stages of the litigation[,] or failed to request the appointment of counsel." *Id.* at 5.

Our review of the record supports the court's conclusions. First, Father admittedly *was* represented at the aggravated circumstances hearing, where he was able to present evidence. Second, the record is replete with docket entries indicating that Father was given notice that he had a right to representation at all stages of the proceedings, and, that if he could not afford an attorney, one would be provided for him. Finally, Father was told that he would need to fill out CYS paperwork in order to determine if he qualified for a court-appointed attorney. Because a parent waives his or her right to counsel if that parent is provided with clear instruction on how to petition for the appointment of counsel, but fails to take action, *In re A.R.*, 125 A.3d 420, 424 (Pa. Super. 2015) (citation omitted), we find no merit to Father's claim.

Finally, Father argues that the trial court improperly terminated his parental rights under section 2511(a)(2)[13] where CYS did not schedule mental health appointments for Father and where "in light of the worldwide pandemic

---

[13] *See* 23 Pa.C.S. § 2511(a)(2) ("The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.").

and mandatory closure of businesses, CYS and the trial court should not have been so strict in the deadlines for Father to comply with the [p]ermanency [p]lan." Father's Brief, at 31. Father references a June 2020 letter, written by Jerry Milner, Association Commissioner for the Administration for Children and Families of the Department of Health and Human Services (Children's Bureau), wherein he urges agencies to "carefully consider whether it is appropriate to terminate a parent's rights pursuant to the 15/22 requirement[14] . . . in light of the devastating impact that the COVID-19 pandemic has had on child welfare systems[.]" *Id.* at 32. The letter also urges "[a]dditional consideration is particularly important when a parent's access to services that are necessary to work toward reunification (such as drug rehabilitation or ability to have parent-child family time) have been compromised as a result of the pandemic." *Id.*

_____

[14] Father is referencing 42 Pa.C.S. § 6351(f)(9), which states:

> [I]f the child has been in placement for at least 15 of the last 22 months **or** the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the home or to preserve and reunify the family need not be made or continue to be made, [the court shall] determine whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child.

*Id.* (emphasis added).

- 17 -

Again, the fact remains that Father had plenty of opportunities to receive treatment for his drug and mental health issues after Children's placement and well before he was incarcerated. In addition, Father had the opportunity for almost 100 virtual or telephonic visits with Children over that 14-month span. As a parent, Father was required to "act affirmatively with good faith interest and effort . . . in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." **In re B., N.M.**, **supra**. Unfortunately, Father was unable to meet this task.

While Father maintains he has been complying with his service goals since he has been incarcerated, these efforts are just too little too late. Children now experience stability in their resource home—stability they have never had before. **See** N.T. Goal Change/Termination Hearing, 6/7/21, at 40-42 (CYS caseworker testifying Children have shown significant progress in school since living with foster family, Children have made "a one hundred and eighty degree turn from where [they ] started[] in regards to their education," and emotionally Children have worked through coping skills and are managing anger and expressing emotions "very well"). Although Children admittedly miss Parents, they no longer have "remorse or anxiety following the[ir] visits [with Parents]." **Id.** at 43 ("[T]hey don't show any distress or sadness at all when visits end with [P]arents."). **See In re B., N.M.**, **supra** at 856 ("[A] parent's basic constitutional right to the custody and rearing of his . . . child is converted, upon the failure to fulfill his . . . parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a

permanent, healthy, safe environment."). Accordingly, the record supports the court's conclusion that clear and convincing evidence exists to terminate Father's parental rights to Children.

Orders affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/25/2022