J-S18004-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE MATTER OF: THE ADOPTION OF: C.D.T., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.L.T., MOTHER | : : : : : : : | |
| | : | No. 79 WDA 2024 |

Appeal from the Decree Entered December 20, 2023
In the Court of Common Pleas of Erie County
Orphans' Court at No(s):  82 in Adoption 2023

BEFORE:  PANELLA, P.J.E., McLAUGHLIN, J., and SULLIVAN, J.

MEMORANDUM BY PANELLA, P.J.E.:                    **FILED: June 24, 2024**

J.L.T. ("Mother") appeals from the decree entered in the Court of Common Pleas of Erie County that granted the petition of Erie County Office of Children and Youth ("OCY") and involuntarily terminated Mother's parental rights to C.D.T. (d.o.b. 7/2017) ("Child").[1] Counsel has filed an application to withdraw pursuant to ***Anders v. California***, 386 U.S. 738 (1967). After our careful review, we affirm the decree and grant counsel's application to withdraw.

Mother is the biological mother of Child. The orphans' court explained:

> On September 3, 2022, the Union City Police conducted a welfare check at [M]other's home where she was residing with [Child], his older siblings, and [M]other's paramour. The caller to the Union City Police alleged [Child] and his eight-year[-]old sibling were left home alone and [M]other was under the influence

---

[1] Child's biological father is deceased.

of alcohol. Upon arrival at the home, the police officers found the door and windows to the home wide open. The home was dirty and full of garbage and debris. A neighbor had taken [Child] and his sibling to her home as the children were left home alone. [Child] was observed to be covered in dirt, shirtless, and wearing torn jeans. On September 6, 2022, OCY received an allegation [Child] was hit in the mouth by [M]other's paramour.

This incident was the family's twenty-second referral to OCY. [M]other has an extensive history with OCY dating back to 2013 for concerns regarding [M]other's drug and alcohol abuse, poor home conditions, untreated mental health concerns, domestic violence issues, the children being left home alone, and [M]other's ongoing inability to meet the children's basic physical and emotional needs.

Pursuant to an emergency placement order of September 6, 2022, [Child] … [was] removed from [M]other's home and placed with [his] paternal aunt.[2] …

* * *

… [C]hild …[was] adjudicated dependent by Order of October 12, 2022. A dispositional treatment plan was prepared by OCY to achieve the goal of reunification with [M]other. … [M]other was ordered to comply with the following:

1. Engage in mental health services as recommended by Corry Counseling, follow recommendations, and demonstrate skills learned;

2. Obtain and/or maintain safe and stable housing;

---

[2] Mother has five children and they have all been removed from her care. Child's siblings, K.T. and B.T., were placed into protective custody on September 6, 2022. K.T. turned 18 during the dependency case, and B.T. was reunified with her father. Child's other siblings, R.T. and "EJ," had been removed prior to the subject September 2022 incident. Because Mother failed to comply with the treatment plans for their reunification, R.T. is in custodianship with her grandparents and E.T. is in the primary custody of an aunt. **See** N.T., 12/3/23, at 29-30, 78.

> 3. Participate in a drug and alcohol assessment and follow through with recommendations and demonstrate skills learned;
>
> 4. Refrain from the use of drugs and alcohol and submit to color code testing through the Esper Treatment Center;
>
> 5. Participate in Home Makers program and demonstrate an ability to maintain safe and stable living conditions;
>
> 6. Participate in an approved parenting program and demonstrate skills learned; and,
>
> 7. Participate in a psychological evaluation with Dr. Peter von Korff and follow through with recommendations and demonstrate mental health stability.

Orphans' Court Opinion, 1/25/24, at 2-3 (record citations omitted).

At the one-month permanency review hearing held on November 9, 2022, the goal remained reunification with a concurrent goal of adoption; the court maintained the above treatment plan, adding that Mother had to participate in Project First Step and have supervised visits with Child, contingent on Mother being clean, sober, and mentally stable at the time of the visit. The court found Mother had made minimal progress in alleviating the conditions that resulted in Child's placement. *See* Petitioner's Exhibit 4, Permanency Review Order, 11/16/22.

At the March 1, 2023 review hearing, the court found Mother had made moderate progress with her treatment plan and ordered that she allow OCY to access her home. *See id.* at Permanency Review Order, 3/3/23. At the June 26, 2023 review hearing, the court found Mother was minimally compliant with the treatment plan and Mother had made no progress in alleviating the

circumstances that led to Child's placement. The court changed the goal to reunification with a concurrent goal of placement with a legal custodian. ***See id.*** at Permanency Review Order, 6/28/23. By the time of the October 4, 2023 permanency review hearing, Child had been in placement for one year and four weeks. The court changed the permanency goal to adoption due to Mother's failure to make any satisfactory progress with her treatment plan. ***See id.*** at Permanency Review Order, 10/5/23.

On October 11, 2023, OCY filed a petition to involuntarily terminate Mother's parental rights to Child pursuant to Sections 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b) of the Pennsylvania Adoption Act, 23 Pa.C.S.A. §§ 2501-2514.. The court held a termination of parental rights ("TPR") hearing on December 7, 2023. OCY presented the testimony of licensed psychologist Dr. von Korff and OCY supervisors Christine Hubbard and Shannon Spiegel. Mother testified on her own behalf.

Dr. von Korff testified he met with Mother six times between October 21, 2022 and December 12, 2022 to evaluate her. ***See*** N.T., 12/7/23, at 6-24; Petitioner's Exhibit 7. The evaluation provided "a very broad picture of [Mother's] personal, psychological, and social maladjustments…." N.T., 12/7/23, at 9. Mother recognized she had difficulty making sense of the events in her life. ***See id.*** at 10.

Dr. von Korff explained Mother has persecutory thoughts, is paranoid, mentally confused, strong-willed and determined, and believes she is being

- 4 -

victimized by OCY and unjustly judged by others. *See id.* at 10-12, 15, 20. Due to this, service providers have a difficult time working with Mother and she is not making progress in therapy. *See id.* at 12. Dr. von Korff concluded Mother needs significant health services and parenting therapists to assist her with safe parenting skills to enable her to raise healthy children. *See id.* at 16. However, at the time of the TPR hearing, Dr. von Korff was not aware of Mother having any successful collaborative ongoing relationships with any parenting or mental health therapist because she internalizes what people say to her and she shuts down when she does not get the answers she wants. *See id.* at 17, 22. This negatively affects Mother's ability to parent Child safely. *See id.* at 23.

On cross-examination, Dr. von Korff acknowledged Mother demonstrated the ability to face some of her mental health issues, and was willing to engage in services for herself and her children. The doctor admitted he had never seen Child and Mother interact, but that Mother spoke of Child "with great affection". *Id.* at 19-20. Dr. von Korff stated Mother was on Buspar and Paxil for her mental health issues, and that she was supportive of the counseling services that she received, but that she had difficulty internalizing changes. He stated he was concerned that, although Mother understood and recognized Child's issues, she did not understand her role in those issues. *See id.* at 22-24.

OCY supervisor Christine Hubbard testified next. During Hubbard's testimony, Mother was removed from the courtroom by deputies after she failed to heed two warnings from the orphans' court to control herself. *See id.* at 19-20, 35-36, 51. Hubbard testified she had significant involvement with Mother between January 2022 and July 2023 due to Mother's older children being removed from her care. Three of Mother's children were placed in permanent alternative placements because Mother failed to comply with the treatment plans for their reunification. *See id.* at 30-32.

Mother remained in denial about why Child was removed from her care throughout the life of this case and continued to display mental health instability. She was verbally aggressive with the caseworkers, combative and erratic, refused to sign releases, and tested positive for marijuana.[3] *See id.* at 33, 36, 38, 49.

Mother was being evicted from her home for failure to pay rent at the time of the first review hearing in November 2022 and still had not acquired appropriate housing by the June 2023 review hearing. *See id.* at 39. Mother had moved from place to place until moving into a trailer on her mother's property that did not have hookups for water or electricity, had a hole in the

_____

[3] OCY's Exhibit 6, Urinalysis Screen Results of Mother, reflected that, out of 120 tests, Mother tested negative only two times. *See* Petitioner's Exhibit 6. However, Mother produced a medical marijuana card and receipts that showed she purchased the marijuana from a dispensary. *See* N.T., 12/3/23, at 47, 49.

roof, and Mother had to wear a hazmat suit to enter. ***See id.*** at 40. The property contained old broken-down vehicles, broken glass, and tires. ***See id.*** at 39. Mother insisted OCY should pay to fix up her home by giving her Lowes and Home Depot gift cards and paying for the installation of an electric box. ***See id.*** at 41, 52. Although Mother had a voucher for Section 8 housing at one point, she let it expire. ***See id.*** at 49. Hubbard found at least one apartment for Mother, but Mother would not even look at it because she did not want to live in the apartment's neighborhood, preferring to live in the trailer on her Mother's property. ***See id.*** at 50. OCY referred Mother to Erie County Care Management and the GECAC agency for housing referrals but Mother refused their help. ***See id.*** at 49-50.

Mother did attend most visits with Child and would bring food. ***See id.*** at 43. However, the visits would become escalated because of her inappropriate communication. Hubbard affirmed that Mother's lack of mental health stability had a direct negative impact on Child. ***See id.***

Mother did not avail herself of other help and suggestions from OCY. ***See id.*** at 50. Although Mother was provided the services of Project First Step, a parenting program, and the JusticeWorks Center, a visitation program, she refused to sign releases for the programs. ***See id.*** at 34-35. Mother was combative with the JusticeWorks Center caseworker, who reported Mother displayed mental health instability, had poor impulse control, and was difficult.

According to the caseworker, this interfered with Mother's visits with Child, even though she did attend most of them. *See id.* at 34-35, 53.

OCY's Exhibit 8, the report of parenting program Project First Step, noted Mother continued to live in deplorable conditions, did not understand the clean and safe environment necessary for Child, believed she had done nothing wrong, and refused services or any help/guidance from Project First Step staff. *See* Petitioner's Exhibit 8. Mother refused to look for employment and continued to depend on social security for income. Hubbard testified Mother obtained medication from Corry Counseling, but did not provide proof that she was attending therapy. Hubbard said that, even if Mother was going to therapy, she was not internalizing the therapy because "she was not demonstrating mental health stability." *Id.* at 53.

Hubbard testified that a psychological evaluation determined Child was traumatized and needed mental health counseling. *See id.* at 42. Although Mother attended most weekly visits, they had a negative impact on Child because of Mother's mental health issues. *See id.* at 43. Hubbard affirmed that Mother's lack of mental health stability caused Child to be without proper parental care and control. *See id.* at 45. Because Mother refused to acknowledge the circumstances that led to Child's placement, she was unable to alleviate them. *See id.* at 44-45.

Hubbard acknowledged she did not view Child and Mother together. However, based on information given to her by the current caseworker and

the caseworker supervisor, Hubbard testified there would be no negative impact on Child if Mother's parental rights were terminated because, prior to his removal from Mother's home, all Child had ever known was "lack of supervision, untreated mental health, [Mother] drinking in the caregiving role[, and] domestic violence." *Id.* at 45.

Meanwhile, Hubbard testified Child is in a stable environment where he can "be a child" and involved in "child-specific activities." *Id.* at 46. Child is very bonded with his aunt, and Hubbard was not aware of him ever asking about Mother. *See id.* at 46. When asked on cross-examination if it would surprise her to hear that Child said he loved his aunt but wanted to return to Mother, Hubbard explained, "on this job a lot of the children we work with feel that way. You know, they love their parents, and so I guess it would surprise me, but [at the same time] it wouldn't." *Id.* at 54-55. At the conclusion of Hubbard's testimony, Mother was returned to the courtroom. *See id.* at 58.

OCY supervisor Shannon Spiegel was the immediate supervisor to Ms. Twanisha Franklin, who took over as the ongoing caseworker for the family at the end of June 2023. Spiegel supervised Mother's case from July 2023 until the TPR hearing and made similar observations as those of Hubbard. For instance, Spiegel testified Mother still had not obtained appropriate housing and that her trailer remained in deplorable condition, with extensive damage, and without any running water or electricity. *See id.* at 52,62. As of the date of the TPR hearing, Mother planned to move to Oklahoma with her sister since

- 9 -

allegedly no one in Erie would help her. Mother continued to demonstrate mental health instability and, at a team meeting, she discussed aliens, heaven and hell, and reported Child has powers. *See id.* at 63. Because Child's older brother, K.T., was questioning his sexuality, mother said he needed to "remove demons to [enable] him to go to the ninth realm." *Id.* at 63. She also maintained that "the kids shouldn't eat food." *Id.* at 64.

Spiegel testified Mother expressed an interest in having psychiatric services at Stairways Behavioral Health, and she continued to attend Corry Counseling. However, Spiegel opined that Mother continued to demonstrate mental instability, and that she was unable to safely parent Child. *See id.* at 64-65. Spiegel had testified previously at the October 2023 permanency review hearing that the goal of adoption was necessary for Child because of Mother's continued mental health instability, difficulty working with service providers, and Mother's failure to follow provider recommendations. *See id.* at 65. Spiegel testified Child has neither asked about Mother, stated he misses her, nor asserted that he wants to return to her care. *See id.* at 66. The only person he ever asks about is his sister. *See id.* Spiegel stated that Mother was unable to demonstrate she could safely parent Child, and that Child is doing well educationally, physically, and emotionally in his placement with his aunt. *See id.* According to Spiegel, termination of Mother's parental rights would not have a negative impact on Child and would best serve his needs and welfare. *See id.* at 68.

Mother testified that no one in Erie will help her properly, so she was planning to move to Oklahoma where her sister lives. *See id.* at 72-73, 90. She continued to blame OCY for not providing her with resources to achieve reunification even though the treatment plan included referrals for appropriate housing, transportation, parenting classes, and mental health referrals. *See id.* at 75-76. Mother stated she has been unemployed and on disability since she was 21 due to post-traumatic stress disorder, bipolar disorder, and borderline personality disorder. *See id.* at 73. Mother refused to acknowledge her role in causing Child's removal and instead blamed her family's interference and OCY for making up "cockamamie stories" to take away her five children "bit by bit by bit by bit by bit." *Id.* at 78; *see id.* at 74.

According to Child's legal counsel, it is in Child's legal interest to be returned to Mother because, although Child told her he was very happy with his aunt, Child unequivocally expressed he wants to return to Mother. *See id.* at 92. Meanwhile, Child's guardian *ad litem* said that termination of Mother's parental rights was in Child's best interest because Mother is mentally unstable and has chosen not to avail herself of the opportunities OCY provided for her to get everything she needs to comply with the treatment plan. *See id.* at 93. The guardian *ad litem* believed it was in Child's best interests to remain in placement with his aunt, where Child is doing very well and had lived for approximately 15 months at the time of the hearing. *See id.*

- 11 -

The orphans' court found OCY met its burden of providing clear and convincing evidence to support its petition. On December 20, 2023, the court entered an order changing Child's permanency goal to adoption and a decree terminating Mother's parental rights pursuant to Sections 2511(a)(1), (a)(2), (a)(5), (a)(8) and (b) of the Pennsylvania Adoption Act. Mother timely appealed and filed a contemporaneous statement of errors complained of on appeal. *See* Pa.R.A.P. 1925(a)(2)(i). The trial court filed a Rule 1925(a) opinion on January 25, 2024.[4] Counsel has filed an *Anders* brief and application to withdraw on the basis that the appeal is wholly frivolous. Mother has not responded.

Counsel filed an *Anders* brief and application to withdraw on March 8, 2024. This Court determined the documents did not comply with the requirements of *Anders*, *Commonwealth v. McClendon*, 434 A.2d 1185 (Pa. 1981), and *Commonwealth v. Santiago*, 978 A.2d 349 (Pa. 2009), and directed Counsel to file either a compliant *Anders* brief or an advocate's brief by March 22, 2024. *See* Order, 3/15/2024. Counsel timely complied and filed a new application to withdraw along with an *Anders* brief expressing her belief that Mother's claims are wholly frivolous.

---

[4] The Honorable Judge Shad Connelly presided over the TPR hearing. The Honorable Judge Peter A. Sala authored the Rule 1925(a) opinion, as Judge Connelly has since retired.

Before reaching Mother's issues, we must first consider the sufficiency of counsel's petition to withdraw and the accompanying brief. *See In re Adoption of B.G.S.*, 240 A.3d 658, 661 (Pa. Super. 2020) ("When faced with a purported *Anders* brief, this Court may not review the merits of the underlying issues without first passing on the request to withdraw.") (citations omitted).

> In order to withdraw pursuant to *Anders*, counsel must:
>
> 1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) furnish a copy of the *Anders* brief to the appellant; and 3) advise the appellant that he or she has the right to retain private counsel or raise additional arguments that the appellant deems worthy of the court's attention.

*Id.* (citation and brackets omitted). "Counsel must provide this Court with a copy of the letter advising the appellant of his or her rights." *Id.* (citing *Millisock*, 873 A.2d at 752. The *Anders* brief must: "(1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; [and] (3) set forth counsel's conclusion that the appeal is frivolous [and the reasons for the conclusion]." *Id.*

In the instant matter, counsel has complied with the procedural *Anders* requirements, and we may proceed to review the issues outlined in her brief. In addition, we must "conduct an independent review of the record to discern if there are any additional, non-frivolous issues overlooked by counsel."

- 13 -

***Commonwealth v. Flowers***, 113 A.3d 1246, 1250 (Pa. Super. 2015) (footnote and citation omitted).

The ***Anders*** brief provides one issue for this Court's review: "Whether the juvenile court committed an abuse of discretion and/or error of law when it concluded that the Agency established, by clear and convincing evidence, the grounds for involuntary termination of Mother's parental rights under 23 Pa.C.S.A. § 2511(a)(1), (a)(2), (a)(5), (a)(8)[] and (b)[.]" ***Anders*** Brief, at viii (suggested answer omitted).

Our scope and standard of review are as follows:

> When we review a decision of [the] trial court to terminate parental rights, we must accept the findings of fact and credibility determinations of the trial court if the record supports them. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. … Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. We may not reverse merely because the record could support a different result. We give great deference to the trial courts that often have first-hand observations of the parties spanning multiple hearings. Moreover, the trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence.

***Int. of K.M.W.***, 238 A.3d 465, 473 (Pa. Super. 2020) (citations, brackets, and quotation marks omitted).

Requests to have a natural parent's parental rights terminated are governed by 23 Pa.C.S.A. § 2511 of the Adoption Act, which requires a bifurcated analysis. First, the orphans' court determines if the parent's conduct warrants termination under one of the eleven grounds enumerated in

Section 2511(a). If the court determines that the petitioner has established grounds for termination under Section 2511(a), then it assesses the petition under Section 2511(b), which focuses upon the child's needs and welfare under a best interests of the child standard. *See B.G.S.*, 245 A.3d at 705.

Here, the orphans' court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b). We examine the orphans' court's finding that OCY provided clear and convincing evidence to support termination pursuant to Section 2511(a)(2). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*) (stating that in order to affirm the termination of parental rights, this Court "need only agree with [the orphans' court's] decision as to any one subsection" of Section 2511(a)). The Adoption Act provides, in pertinent part:

> **(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> * * *
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. …

- 15 -

23 Pa.C.S.A. §§ 2511(a)(2), (b).

Although "parental duties" are not expressly defined,

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

**B.G.S.**, 245 A.3d at 707 (citation omitted). "The grounds for termination of parental rights due to parental incapacity that cannot be remedied are not limited to affirmative misconduct; the grounds may include acts of refusal as well as incapacity to perform parental duties." **Adoption of K.J.**, 936 A.2d 1128, 1132 (Super. 2007) (citation omitted). "[T]he petitioner for involuntary termination must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." **Id.** at 1133 (citation omitted).

Instantly, we agree with counsel that Mother's claim is frivolous. In concluding that OCY provided clear and convincing evidence to support the termination of Mother's parental rights under Section 2511(a), the orphans' court explained:

Preserving [Mother]'s parental rights is not an acceptable option in this case. "Parental duty requires that the parent act affirmatively with good faith and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." *In re B.N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004). "A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship." *Id.*

This [c]ourt is clearly convinced that [M]other failed in every instance to utilize the resources provided to her to preserve her parental relationship. Appropriate resources were put into place to help her achieve reunification with [Child]. [M]other obstinately refused the recommended help and/or minimally complied with offered services. She cannot or will not place her child's needs above her own. The skills and judgment needed to provide for the physical and emotional well-being of [C]hild have not been alleviated. [C]hild is placed with an adoptive resource that is meeting [Child]'s physical, emotional, behavioral, educational, and permanency needs. The termination of parental rights and adoption is in [C]hild's best interests. The Erie County Office of Children and Youth has met its burden of proof with respect to its burden in establishing the grounds for termination pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).

Orphans' Court Opinion, 1/25/24, at 11-12.

The record amply supports the orphans' court's findings. On September 6, 2022, OCY received the family's 22nd referral to OCY, this time for an allegation that Mother's paramour hit Child in the mouth. Child was adjudicated dependent on October 12, 2022 due to OCY's concerns about Mother leaving Child home alone, her use of drugs and alcohol, mental health, housing instability, and concerns about domestic violence. Child was removed from Mother's home and placed in kinship care with his paternal aunt, J.H,

where he still remains. J.H. is an adoptive resource. At the time of the TPR hearing, Child had been in care for 15 months.

The testimony from all OCY witnesses is that Mother has not made satisfactory progress toward achieving her permanency goals or in alleviating the circumstances that led to Child's placement because she remains in denial about causing the circumstances that led to Child's removal and refuses to cooperate with the services provided to her. Throughout the life of the case, Mother remained verbally aggressive, combative, and erratic to the point that OCY caseworkers and representatives from Project First and JusticeWorks could not reason with her. She failed to obtain employment and suitable housing. Despite living in a trailer on her mother's property that looked like a junkyard and is in such a "deplorable state" that she has to wear a hazmat suit to enter it, she fails to understand it is an unsafe living situation for Child.

Mother's mental health remained OCY's primary concern because Mother failed to address it. Although Mother points to her participation in a psychological evaluation with Dr. von Korff, attendance at Corry Counseling, and her visits with Child as evidence that she is following through on her permanency plan, according to Dr. von Korff, Mother's persecutory thoughts, paranoia, mental confusion, strong will and determination, and her obsessive belief she is being victimized by OCY and unjustly judged by others all render her unable to make any progress in therapy. In fact, by the time of the TPR hearing, Mother had not successfully collaborated with any parenting or

mental health therapists. This is particularly troubling because Mother needs significant health services and parenting therapists to assist her with safe parenting skills that would enable her to raise healthy children. While she does attend most visits with Child, she is often combative and unable to communicate appropriately with him due to her failure to participate in parenting and mental health therapy. As a result, Mother's failure to cooperate in obtaining such services negatively impacts her ability to parent Child safely.

Based on all of the above, we agree with the orphans' court that OCY provided clear and convincing evidence to satisfy Section 2511(a)(2). Based on Mother's complete denial of her responsibility for the circumstances that led to Child's removal and her failure to follow through on services necessary to satisfy her treatment plan, Mother's "repeated and continued incapacity, … neglect or refusal … caused [Child] to be without essential parental care, control or subsistence" and Mother refuses to remedy the situation. 23 Pa.C.S.A. § 2511(a)(2).

Mother also maintains that OCY failed to provide clear and convincing evidence that termination of Mother's parental rights would serve Child's best interests pursuant to 23 Pa.C.S.A. § 2511(b) because there is a bond between her and Child. **See Anders** Brief, at xxiv. We disagree.

Child was "really traumatized" at the time he was removed from Mother's care and has been living with the kinship provider for the life of the case, which is "the first time he has had some stability, so … he's done really

well." N.T., 12/3/23, at 42. Although Mother states that there is a bond between her and Child, Spiegel testified that Child has neither asked about Mother, stated he misses her, nor asserted that he wants to return to her care. The only person he ever asks about is his sister. Hubbard testified similarly that, although she did not observe Mother and Child interact, she was not aware of Child ever asking about his Mother. Hubbard stated that Child is very bonded with his aunt and finally able to just be a child in his aunt's home. Child attends school regularly, receiving appropriate grades, and is current on all medical and dental appointments. Child is doing well educationally, physically, and emotionally in his placement with his aunt, who is an adoptive resource. Both Hubbard and Spiegel testified that termination of Mother's parental rights would be in Child's best interest and that it would not have any negative impact on him.

We acknowledge 6-year-old Child's legal counsel stated at the hearing that termination of Mother's parental rights was not in Child's legal interest because Child told her he wanted to return to Mother. ***See In re Q.R.D.***, 214 A.3d 233, (Pa. Super. 2019) (For termination of parental rights proceedings, "a child's legal interests are synonymous with the child's preference.") (citation omitted). However, this does not affect our disposition.

Hubbard testified she would not be surprised if Child said he wanted to be returned to Mother because many children in this type of situation say that because they love their parents. Moreover, in Child's brief, his counsel seems

to acknowledge this would not be in Child's best interest. Specifically, counsel states that because filing an **Anders** brief is not an option "for separate legal interests counsel appointed for a minor child in an appeal from an involuntary termination of parental rights proceeding," she would "present[] the legal position of [Child] and any evidence adduced at trial which supports same." Participant's Brief, at 22. Therefore, we do not find Child's apparent statement to counsel alters our result, particularly since it was for the court as fact-finder to weigh the evidence.

Based on our review, the clear and convincing evidence supports the orphans' court's finding that termination of Mother's parental rights is in Child's best interest pursuant to Section 2511(b). We agree with counsel that Mother's challenge to the orphans' court's decree involuntarily terminating her parental rights is frivolous.

Decree affirmed. Application to withdraw as counsel granted.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 06/24/2024